STANDARD REALIZATION COMPANY, a Delaware corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 58 C 2084.

United States District Court N. D. Illinois, E. D.

May 31, 1960.

Edward R. Johnston, Alan R. Johnston, Edmond S. Sager and Herbert B. Olfson (of Thompson, Raymond, Mayer, Jenner & Bloomstein), Chicago, Ill., for plaintiff.

R. Tieken, U. S. Atty. for the Northern Dist. of Ill., Chicago, Ill., Howard A. Heffron, Acting Asst. Atty. Gen., James P. Garland, Charles W. Mehaffy and Herbert L. Awe, Dept. of Justice, Washington, D. C., for defendant.

PERRY, District Judge.

Plaintiff, Standard Realization Company, brings this action to recover alleged overpayments of income and excess profits taxes made by plaintiff under protest on deficiency assessments after the Commissioner had disallowed its claims for refund.

 Plaintiff, which was engaged in the mining of quartzite at its mine located near Ottawa, Illinois, and in the processing and sale of silica sand and flour at its plant located at Ottawa, Illinois, contended that it should have been allowed certain expenses incurred by it incident to the bagging of silica and flour and also contended that the adjustments made by the Commissioner as well as the deficiencies determined by him and the assessments resulting therefrom were erroneous and illegal because, as it alleged in its complaint:

"(a) Percentage depletion should have been computed at the rate of 15%, rather than 5% as computed by the Commissioner. The product mined, quarried or otherwise extracted by plaintiff, and sold by it, is quartzite within the meaning of Section 114(b) (4) (A) (iii) of the Internal Revenue Code of 1939 as amended [26 U.S.C.A. § 114(b) (4) (A) (iii) ], and, accordingly, plaintiff properly computed its depletion by applying a rate of 15%.

"(b) Said percentage depletion should have been computed on the net selling price of all grades of plaintiff's product without adjustment and in computing "gross income from the property," as defined in Section 114(b) (4) (B) of the Internal Revenue Code of 1939, as amended, plaintiff is entitled to include as 'ordinary treatment process' the cost of, and profit on, items

including, but not limited to, screening, grinding, bagging, bags, loading for shipment, and shipping material."

The Commissioner viewed plaintiff's operations as a scooping up of sand instead of the mining of quartzite and therefore computed the percentage depletion at only 5% instead of 15%.

During the trial of the cause which was heard by the court sitting without a jury, evidence was introduced which conclusively established that plaintiff's operations—which consisted of blasting hard quartzite rock with dynamite and then breaking it down by the use of hydraulic pumps—were indeed regular mining operations carried on in order to prepare the quartzite for commercial use.

Having heard and considered the evidence herein, the exhibits introduced at the trial, the briefs submitted by counsel, and being fully advised in the premises, the court finds the facts and states the conclusions of law as follows:

### Findings of Fact.

1. Plaintiff is a dissolved corporation organized under the laws of the State of Delaware, qualified to do business as a foreign corporation in Illinois, with its principal place of business in Chicago, Illinois.

2. Plaintiff was incorporated in Delaware on October 2, 1953, under the name "Blackhawk Mining Corporation" as a wholly owned subsidiary of Standard Silica Corporation, an Illinois corporation (sometimes hereinafter referred to as "Illinois Standard"). Effective November 9, 1953, Illinois Standard was merged by statutory merger procedure, into its wholly owned subsidiary, Blackhawk Mining Corporation. All of its assets were thereby transferred to the surviving Delaware corporation, and the corporate name of the surviving corporation, the plaintiff herein, was changed to Standard Silica Corporation. On January 5, 1955, the corporate name of plaintiff was changed to Standard Realization Company.

3. On or about December 2, 1955, plaintiff was dissolved as a corporation pursuant to the laws of the State of Delaware. In connection with said dissolution, and as part of said dissolution procedure, plaintiff, on or about December 30, 1954, sold all of its mining properties and other tangible assets to Ottawa Silica Company, a Delaware corporation, and it has paid two liquidating dividends to its stockholders from the proceeds of said sale. Plaintiff has not since said sale and is not now carrying on any business activities other than taking the necessary steps to collect a refund of the Federal income and excess profits taxes which are the subject matter of this suit.

4. Under the laws of the State of Delaware, a corporation incorporated under the laws of that state, and dissolved under said laws, continues in existence for the term of three years from the date of its dissolution for certain specific purposes, 8 Del.C. § 278; the period of three years from the date of dissolution of the plaintiff expired on December 3, 1958.

5. Under the laws of the State of Delaware, a corporation incorporated under the laws of such state, and dissolved under such laws, continues to be a body corporate beyond such three-year period with respect to any action, suit or proceeding begun or commenced by or against said corporation within said three-year period. The suit of the plaintiff was commenced within said period.

6. On or about March 10, 1953, the plaintiff's predecessor, Illinois Standard, filed in the office of the Collector of Internal Revenue at Chicago, Illinois, its Federal corporate income and excess profits tax return for the calendar year 1952, and paid the tax shown thereon in the amount of $86,000.78 in installments on March 12, 1953, June 18, 1953, September 21, 1953, and December 14, 1953.

7. On or about February 11, 1954, the plaintiff filed in the office of the District Director of Internal Revenue at Chicago, Illinois, a Federal corporate income and excess profits tax return on behalf of its predecessor, Illinois Standard, for its taxable period January 1, 1953 through November 8, 1953, and paid the tax shown thereon in the amount of $130,107.42 in installments on February 15, 1954, May 12, 1954, August 6, 1954, and December 12, 1954.

8. On or about March 8, 1954, the plaintiff filed in the office of the District Director of Internal Revenue at Chicago, Illinois, its Federal corporate income and excess profits tax return for its taxable period November 9, 1953 through December 31, 1953, and paid the tax shown thereon in the amount of $12,528.25 in installments on March 15, 1954, June 15, 1954, September 14, 1954, and December 8, 1954.

9. On or about June 14, 1955, the plaintiff filed in the office of the District Director of Internal Revenue at Chicago, Illinois, its Federal corporate income tax return for the calendar year 1954, and paid the tax shown thereon in the amount of $77,059.97 in installments on March 11, 1955 and June 15, 1955.

10. On or about March 4, 1958, plaintiff filed timely and proper claims for refund in the amount of $6,867.84 for the calendar year 1952, in the amount of $14,401.93 for the taxable period January 1, 1953 through November 8, 1953, and in the amount of $1,367.60 for the taxable period November 9, 1953 through December 31, 1953.

11. Said three claims for refund were based on the fact that plaintiff's predecessor, Illinois Standard, and plaintiff, on the returns for the three tax periods covered by said claims, had erroneously adjusted the basis for computation of percentage depletion by excluding certain bagging costs and had erroneously included, in computing the gross income from the property, sales of ground silica at the average selling price of unground grades of silica rather than at the net selling price of such ground silica.

12. The United States sent plaintiff notices on November 17, 1958, disallowing in full said three claims for refund,

which notices were received by plaintiff on November 18, 1958.

13. By letters dated July 15, 1958, the United States, acting through the Commissioner of Internal Revenue, notified plaintiff of the determination of deficiencies in income and excess profits taxes in the amount of $74,916.25 for the calendar year 1952, the amount of $108,314.12 for the taxable period January 1, 1953 through November 8, 1953, the amount of $18,746.54 for the taxable period November 9, 1953 through December 31, 1953, and the amount of $51,615.31 for the calendar year 1954.

14. The adjustments of the Commissioner of Internal Revenue, insofar as here relevant, resulted from his determination that plaintiff and its predecessor, Illinois Standard, were entitled to compute percentage depletion at the rate of 5%, rather than the rate of 15% used on the returns, and that "the gross income from the property" on which said percentage depletion should have been computed was less than the net selling price of all grades of plaintiff's product.

15. The asserted deficiencies in taxes totaling the amount of $253,592.22, with interest thereon in the amount of $72,620.47, were paid under protest by the plaintiff on November 20, 1958 to the defendant's District Director of Internal Revenue at Chicago, Illinois.

16. The plaintiff filed timely and proper claims for refund with respect to and in the amount of said taxes and interest on November 26, 1958, and duplicates of said claims for refund on November 28, 1958, with defendant's District Director of Internal Revenue at Chicago, Illinois.

17. Notices of disallowance in full of said claims for refund were sent by the United States to the plaintiff on November 28, 1958, and were received by the plaintiff on December 1, 1958.

18. The principal business of plaintiff and of its predecessor, Illinois Standard, (hereinafter referred to as "plaintiff") at all times mentioned herein, was the mining of quartzite at its mine located near Ottawa, Illinois, and the processing and sale of silica sand and flour at its plant located at Ottawa, Illinois.

19. Plaintiff's mineral exists in a rock formation which has to be uncovered by the removal of overburden. The upper surface is then cleansed in preparation for extraction of the mineral. The rock is so firm that sheer walls have stood for years bearing the weight of railroad tracks, and tunnels through the mine have stood for years without any support whatever.

20. The exposed rock formation must then be blasted by dynamite. Dynamite charges of 250 to 300 pounds are placed in drilled holes approximately 30 feet apart and some 12 feet from the face of the quarry. Secondary blasting is then necessary to break up the remaining pieces. During the tax periods here in question, the plaintiff used large quantities of high explosives in connection with its mining operations.

21. Following the secondary blasting, the disintegrating process is continued by means of high-pressure water jets directed against the exposed surface of the partially disintegrated rock and by the use of sledge hammers. The small pieces and particles are then carried by water to the base of the quarry where the mixture of quartz particles and water is pumped through rubber-lined pipes to the processing plant. The granular quartz are then subjected to primary and secondary washing operations which consist of agitating the grains and subjecting them to high-pressure jets, further disintegrating the quartz particles and removing the binder material, which also consists largely of quartz.

22. Following the washing, the granular quartz is placed in bins to drain and is then dried in steam dryers, screened over multiple vibrating screens, and graded into nine sizes and sold by plaintiff under the trade name "Blackhawk Silica Sand." The separation into various sizes is necessary in order to meet the commercial demand for the product. A portion of the larger grain-sized quartz particles is ground into pulverized

form and sold in several different degrees of fineness under the trade name "Microsil Ground Silica."

23. A portion of the plaintiff's product is then loaded in bulk in freight cars. This requires the sealing of each freight car prior to the loading, by lining the car with paper, in order to prevent seepage and the possible intrusion of impurities. The balance of plaintiff's product is packaged in bags which are then sealed and loaded into freight cars for shipment.

24. The total shipments of silica made by the plaintiff for the years 1952, 1953 and 1954 showing, for each of said years, in tons and dollars, ground and unground silica, and ground and unground silica shipped in bags, is as follows:

| | Silica (Not Ground) | | Microsil (Ground Silica) | |
|---|---|---|---|---|
| | Tons | Dollars | Tons | Dollars |
| **1952** | | | | |
| Total shipments for the year | 217,854 | $ 825,248 | 58,735 | $541,932 |
| Total shipped in bags | 42,107 | 394,749 | 32,031 | 340,220 |
| **1953** | | | | |
| Total shipments for the year | 244,639 | 1,142,070 | 59,710 | 568,873 |
| Total shipped in bags | 63,243 | 691,857 | 31,443 | 347,468 |
| **1954** | | | | |
| Total shipments for the year | 243,007 | 1,229,431 | 46,003 | 451,632 |
| Total shipped in bags | 71,524 | 787,440 | 23,948 | 273,681 |

25. Chemical analysis of the raw material from plaintiff's mine shows a pure quartz or silicon content of approximately 98.40%. Chemical analysis of plaintiff's product as shipped for various commercial uses shows a pure quartz or silicon content of approximately 99.82%. Plaintiff's product as shipped for various commercial uses has a melting point of approximately 3200 degrees F.

26. All of plaintiff's product was sold and shipped for various commercial uses and was sold and purchased solely on the basis of its chemical or physical properties or both. All of plaintiff's product was usable for refractory purposes, and a substantial part of the product was sold for said purposes.

27. During the tax periods here in question, plaintiff's product was sold to and purchased by the following industries: petroleum, glass, building materials, manufacture, steel foundries, ceramics, aluminum and magnesium foundries, soaps and detergents, brass and other non-ferrous foundries, carbide and carbon, paints and pigments, and others.

28. During the tax periods here in question, none of plaintiff's product was used or sold for use as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes.

29. During the tax periods here in question, plaintiff's product was sold at prices ranging from $2.50 per ton, to

$19 per ton, f. o. b. its plant at Ottawa, Illinois. Plaintiff's product was shipped to both coasts of the United States and was exported to Canada and Mexico. In many instances the freight charges for such shipments were several times the selling price of the product.

30. Plaintiff's product was not used in the construction or building industries for any of the same purposes as common sand. Plaintiff's product was sold at a price averaging many times that of sand and did not compete with or attempt to compete with common sand in any substantial market.

31. In the industries producing and purchasing silica sand and flour, the commonly accepted commercial meaning of "quartzite" is a rock containing a high percentage (at least 95%) of quartz. Plaintiff's mineral deposit is quartzite within the commercial meaning of the term.

32. In geological terms, quartzites may be divided into two classes: meta-quartzites and orthoquartzites. Meta-quartzites are those quartzites resulting from metamorphic processes; ortho-quartzites, those resulting from sedimentary processes. The known deposits of metaquartzite, at least within the United States, are rare, and the occurrence of accessible metaquartzite and its utilization for commercial purposes is rarer still.

33. Plaintiff's deposit is a rock, consisting almost exclusively of quartz grains cemented together by quartz cement. This quartz or silica cement is a pure quartz overgrowth on the grains themselves, an overgrowth which has resulted from natural processes. Plaintiff's mineral deposit is an orthoquartzite and, as orthoquartzite, plaintiff's deposit is quartzite within the geological meaning of the term.

34. During the tax periods here in question, plaintiff's silica sand and flour competed in almost all uses for which it was sold on a basis of interchangeability, limited only by such factors as location and shipping costs, with silica sand and flour derived from quartzites more firmly cemented than plaintiff's quartzite, quartzites so firmly cemented that, when subjected to pressure, they would generally break across rather than around the quartz grains. Whether the ultimate product, silica sand and flour, was derived from quartzite so firmly cemented that it would generally break across the grains rather than around the grains was of virtually no significance to the industries purchasing silica sand and flour.

35. During the tax periods here in question, plaintiff processed a portion of its quartzite into silica sand by the application of the ordinary treatment processes normally applied by mine owners and operators in the silica industry having similar mineral deposits. During said tax periods, there was not any commercial market, within the market areas available to plaintiff, for any additional amounts of such silica sand nor was there any commercial market available to plaintiff for any product at any earlier stage of extraction and processing. The first commercially marketable mineral product derived by plaintiff from processing such portion of its quartzite was said silica sand ready for shipment at plaintiff's plant in bulk or in bags. Plaintiff sold all of said silica sand that it could market on a commercial basis for profit during said tax periods.

36. During the tax periods here in question, plaintiff processed a portion of its quartzite into silica flour by the application of the ordinary treatment process normally applied by mine owners and operators in the silica industry having similar mineral deposits. Many of plaintiff's customers could use only ground silica. During said tax periods, there was not any commercial market, within the market area available to plaintiff, for any other product at any earlier stage of extraction and processing, except for the portion of its quartzite extracted and used by plaintiff in the processing of its silica sand. The first commercially marketable mineral product derived by plaintiff from processing such portion of its quartzite as was sold

as silica flour was said silica flour ready for shipment at plaintiff's plant in bulk or in bags.

37. The ordinary treatment processes applied by plaintiff to its quartzite, in order to obtain the first commercially marketable product, included the bagging of some of its silica sand and flour derived from said quartzite and the loading of its silica sand and flour at its plant either in bulk or in bags. Many of plaintiff's customers could use silica sand or silica flour only when shipped in bags, either because of lack of unloading facilities for bulk shipments or because of the particular end use of the product. During the tax periods here in question, plaintiff sold all the silica sand and flour derived from its quartzite in bulk which it could so market; and since there was not at any time during said tax periods any commercial market, within the market area available to plaintiff, for that portion of its silica sand and flour which was sold in bags other than in such containers, its first commercially marketable mineral product for that portion of its production was said portion of its silica sand and flour in bags.

### Conclusions of Law.

1. This Court has jurisdiction of the subject matter and of the parties to this action pursuant to Section 1346(a) (1) of Title 28 of the United States Code. All formal prerequisites to suit have been complied with.

2. Plaintiff's mineral deposit at Ottawa, Illinois, was "quartzite" and subject to a percentage depletion allowance at the rate of 15% of plaintiff's gross income from mining under the provisions of Section 114(b) (4) (A) (iii) of the Internal Revenue Code of 1939, as amended, and Section 613(b) (6) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 613(b) (6). Said mineral deposit was within the designation "all other minerals" contained in Section 613(b) (6) of the Internal Revenue Code of 1954. Said mineral deposit was not "sand", "gravel", or "stone" as those terms are used in Section 114(b) (4)

(A) (i) of the Internal Revenue Code of 1939, as amended, or Section 613(b) (5) (A) of the Internal Revenue Code of 1954.

3. The treatment processes applied by plaintiff to its quartzite were "ordinary treatment processes normally applied by mine owners and operators" within the meaning of Section 114(b) (4) (B) of the Internal Revenue Code of 1939, as amended, and Section 613(c) (2) of the Internal Revenue Code of 1954. Plaintiff's bagging of a portion of the products derived from its quartzite was such an ordinary treatment process under the conditions of the market available to plaintiff during the taxable year ended December 31, 1952, the tax period January 1, 1953 through November 8, 1953, the tax period November 9, 1953 through December 31, 1953, and the taxable year ended December 31, 1954.

4. Plaintiff is entitled to compute its "gross income from mining" with respect to its Ottawa, Illinois mineral deposit under Section 114(b) (4) (B) of the Internal Revenue Code of 1939, as amended, and Section 613(c) of the Internal Revenue Code of 1954 as the net selling price of all grades of its silica, without adjustment.

5. Plaintiff is entitled to judgment for a refund of income and excess profits taxes paid by it under protest with respect to the taxable year ended December 31, 1952, and a refund of interest paid by it on account of the deficiency in income and excess profits taxes determined against it with respect to said taxable year, in the amount of $106,329.77, with interest thereon as provided by law.

6. Plaintiff is entitled to judgment for a refund of income and excess profits taxes paid by it under protest with respect to the taxable period January 1, 1953 through November 8, 1953, and a refund of interest paid by it on account of the deficiency in income and excess profits taxes determined against it with respect to said taxable period, in the amount of $152,991.10, with interest thereon as provided by law.

7. Plaintiff is entitled to judgment for a refund of income and excess profits taxes paid by it under protest with respect to the taxable period November 9, 1953 through December 31, 1953, and a refund of interest paid by it on account of the deficiency in income and excess profits taxes determined against it with respect to said taxable period, in the amount of $24,010.98, with interest thereon as provided by law.

8. Plaintiff is entitled to judgment for a refund of income taxes paid by it under protest with respect to the taxable year ended December 31, 1954, and a refund of interest paid by it on account of the deficiency in income taxes determined against it with respect to said taxable year, in the amount of $64,-128.41, with interest thereon as provided by law.

9. Plaintiff is entitled to judgment that plaintiff recover its costs herein incurred.