**STANDARD REALIZATION COMPANY,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 13169.**

United States Court of Appeals
Seventh Circuit.

April 11, 1961.

248

Lee A. Jackson, Chief, Appellate Section, James P. Turner, Atty., U. S. Dept. of Justice, Washington, D. C., Robert Tieken, U. S. Atty., Chicago, Ill., Abbott M. Sellers, Acting Asst. Atty. Gen., Melva M. Graney, Atty., Dept. of Justice, Washington, D. C., Harvey M. Silets, Asst. U. S. Atty., Chicago, Ill., for appellant.

Edward R. Johnston, Herbert B. Olfson, Chicago, Ill., Thompson, Raymond, Mayer, Jenner & Bloomstein, Chicago, Ill., of counsel, for appellee.

Before DUFFY, KNOCH and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

The Commissioner of Internal Revenue determined deficiencies in plaintiff's (taxpayer's) income and excess profits taxes for the calendar year 1952, for the taxable period January 1, 1953 through November 8, 1953, and for the taxable period November 9, 1953 through December 31, 1953. Such deficiencies were paid by the taxpayer under protest that they were illegally assessed, and this action was commenced to obtain a refund. The amount alleged to have been illegally collected is not in dispute and need not be stated.

Plaintiff is engaged in a mining operation and the primary question for consideration relates to the depletion allowance provided by statute. Its contention is aptly set forth in its complaint which alleged:

"(a) Percentage depletion should have been computed at the rate of 15%, rather than 5% as computed by the Commissioner. The product mined, quarried or otherwise extracted by plaintiff, and sold by it, is quartzite within the meaning of Section 114(b) (4) (A) (iii) of the Internal Revenue Code of 1939 as amended [26 U.S.C.A. § 114(b) (4) (A) (iii)], and, accordingly, plaintiff properly computed its depletion by applying a rate of 15%.

"(b) Said percentage depletion should have been computed on the net selling price of all grades of plaintiff's product without adjustment and in computing 'gross income from the property,' as defined in Section 114(b) (4) (B) of the Internal Revenue Code of 1939, as amended, plaintiff is entitled to include as 'ordinary treatment process' the cost of, and profit on, items including, but not limited to, screening, grinding, bagging, bags, loading for shipment, and shipping material."

The section of the Revenue Code relied upon in the complaint provides for a percentage depletion rate for certain described minerals and other natural deposits as follows:

"(i) in the case of sand, gravel * * * stone (including pumice and scoria) * * * 5 per centum,

"(ii) * * *

"(iii) in the case of * * * quartzite * * * 15 per centum."

The Commissioner in assessing deficiencies determined that the product mined by plaintiff was not quartzite within the meaning of the Revenue Code and plaintiff, therefore, was entitled to a depletion rate of only 5%. Furthermore, the Commissioner disagreed with plaintiff as to the "gross income from the property" as a base for calculating the depletion allowance. The government in defense of the instant suit sought to maintain the same position taken by the Commissioner.

Thus, two issues were presented to the District Court for its decision: (1) whether the taxpayer was entitled to compute its depletion allowance under Section 114(b) (4) (A) of the Internal Revenue Code of 1939 at the 15% rate for quartzite, and (2) whether the taxpayer's percentage depletion base under Section 114(b) (4) (B) of the Internal Revenue Code of 1939 and Section 613(c) of the Code of 1954, 26 U.S.C.A. § 613(c), was its receipts from the sale of silica sand and flour in bulk and in bags or limited to the portion of its gross income which was attributable to crude (unwashed) silica sand.

After trial without a jury, the Court decided both questions in favor of the taxpayer. Consistent therewith, the Court entered its findings of fact, conclusions of law and the judgment from which the government appeals.

There is little if any dispute as to the nature of plaintiff's mining operation and the processes employed in converting its raw into its finished products. Its mineral exists in a deposit of rock formation near Ottawa, Illinois. The rock is composed of quartz grains cemented together with pure quartz cement. The rock is so firm that sheer walls have stood for years bearing the weight of railroad tracks, and large tunnels run through the deposit without other support. In its raw state in the ground the mineral has a pure quartz content of approximately 98.40%. The mineral must first be uncovered by the removal of overburden and the surface cleansed in preparation for its extraction. This requires that the exposed rock formation be blasted by high explosives. Dynamite charges of 250 to 300 pounds are placed in drilled holes approximately 30 feet apart and some 12 feet from the face of the quarry. Secondary blasting is necessary to break up the remaining chunks and slabs. Substantial quantities of high explosives are regularly employed in the extraction processes, both in the primary and secondary blasting, the latter employed to reduce the large rock fragments dislodged by the former.

After the secondary blasting, the disintegrating process is continued by means of high pressure water jets directed against the exposed surface of the partially disintegrated rock and by the use of sledge hammers. The pieces and particles are carried by water to the base of the quarry where the mixture is pumped through rubber-lined pipes for treatment processing. The granular quartz is then subjected to primary and secondary washing operations which consist of agitating the grains and subjecting them to high-pressure jets, further disintegrating the quartz particles and removing the quartz cement binding material.

Following the washing, the granular quartz is placed in bins to drain and dried in steam driers. It is graded into nine sizes by the use of multiple vibrating screens and sold by plaintiff under the trade name, "Blackhawk Silica Sand." A portion of the grain-sized quartz particles are processed into similar sizes by grinding and sold in various degrees of fineness under the trade name, "Microsil Ground Silica."

A part of the product is then loaded in bulk in freight cars. This requires the sealing of each car prior to loading, by lining it with paper so as to prevent seepage and the possible intrusion of impurities. The remainder of the product is packaged in bags which are sealed and loaded in freight cars for shipment.

The silica sand and flour as shipped for various commercial uses have a pure quartz content of approximately 99.82% and a melting point of approximately

3200° F. All of the product is sold and purchased solely on the basis of its chemical, physical or refractory properties. None of the product is used or sold for use as rip rap, ballast, road material, rubble, concrete aggregates or for similar purposes.

Plaintiff's silica sand and flour are sold for a wide variety of industrial uses, such as improving the flow in oil wells, the manufacture of glass, building materials, soaps and detergents, paints and pigments, ceramics, and for use in steel, aluminum and magnesium foundaries. It is not used in the construction or building industries for any of the same purposes as common sand. Its product is sold at a price averaging many times that of sand and does not compete or attempt to do so with common sand in any market.

The Trial Court, after hearing the testimony of numerous witnesses, found [184 F.Supp. 719]:

"31. In the industries producing and purchasing silica sand and flour, the commonly accepted commercial meaning of 'quartzite' is a rock containing a high percentage (at least 95%) of quartz. Plaintiff's mineral deposit is quartzite within the commercial meaning of the term. * *

"33. Plaintiff's deposit is a rock, consisting almost exclusively of quartz grains cemented together by quartz cement. This quartz or silica cement is a pure quartz overgrowth on the grains themselves, an overgrowth which has resulted from natural processes. Plaintiff's mineral deposit is an orthoquartzite and, as orthoquartzite, plaintiff's deposit is quartzite within the geological meaning of the term."

Plaintiff offered the testimony of four witnesses experienced and familiar with the silica industry who testified that the commonly understood commercial meaning of quartzite in that industry was a rock of very high silica content which could be processed into silica sand and flour. The plaintiff and the government each offered the testimony of two experts, scientists and geologists, who freely expressed their opinions as to what constituted quartzite. As might be expected, they did not agree. The essential conflict in their testimony, as we understand, is that the government experts insisted that quartzite refers to a hard, compact rock made up of sand grains so firmly cemented with silica that it will fracture through rather than around the grains. Plaintiff's witnesses considered this distinction of no importance. The Court found:

"Whether the ultimate product, silica sand and flour, was derived from quartzite so firmly cemented that it would generally break across the grains rather than around the grains was of virtually no significance to the industries purchasing silica sand and flour."

A detailed recitation of the testimony would unduly burden our opinion and in the end serve no useful purpose. It is sufficient, we think, that we have carefully considered it, particularly on the point under consideration, and are not in doubt but that it amply supports the findings. The government's argument to the contrary is not impressive. While it has consistently contended that plaintiff's deposit is not quartzite, it has evidenced considerable confusion as to its proper classification under the Internal Revenue Code.

Counsel for the government in his opening statement to the trial Court stated, "As I see this case and as the government sees it, we have only one problem here, and it is our contention that sand is sand." At the conclusion of the trial and after the government's expert witnesses admitted that plaintiff's deposit was a quartz rock but not sand, counsel stated, "I, of course, do not say that the deposit is sand, technically it cannot be * * *." In its main brief in this Court, the government states that the proper classification of the deposit is stone or sand, both of which are depletable at a 5% rate. In its reply brief it contends that the deposit is sandstone but, inasmuch as the statute contains no

such classification, it should be treated as stone within the meaning of the statute. The Commissioner asserted his deficiency on the basis that plaintiff's deposit was sand and not quartzite. It is not strange that the government has abandoned such an illogical and unrealistic position.

Neither do the cases cited by the government furnish any support to its contention that plaintiff's deposit was something other than quartzite. The case most relied upon is South Jersey Sand Co. v. Commissioner, 3 Cir., 267 F.2d 591, in which the Court affirmed a decision of the Tax Court which had held that the taxpayer's product was sand rather than quartzite. In that case, however, the taxpayer's deposit was on top of the ground, from where it was scooped and removed through pipe lines to screening stations. Thus, the factual situation is in great contrast to that here, where plaintiff's deposit is a rock of such strength and substance that it bears the weight of railroad trains and is removable only with the use of dynamite and other processes. The Court in the South Jersey case, in discussing the distinction between quartzite and sand, stated (at page 594):

> "All ordinary definitions of quartzite and sand stress the visible, readily discernible dissimilarities between the two. Quartzite, the hard compact rock. Sand, hard small grains. There is no attempt to merge the one into the other. * * We have neither seen nor has our attention been called to any common or industry usage which attempts to eliminate this very real visual distinction between quartzite and industrial sand."

In United States v. W. R. Bonsal Co., 4 Cir., 279 F.2d 465, the taxpayer's deposit consisted of pebbles ranging in size from a fraction of an inch to several inches in diameter. The Court affirmed a decision holding the deposit to be quartzite in face of the government's contention that it was gravel or stone. Pertinent to the situation here, the Court stated (at page 468):

> "If the taxpayer had been working a massive, original deposit of quartzite, he would have been required to break it up into fragments of such size in order to sell it. In that event, the Commissioner seems to concede he would be entitled to depletion for quartzite. The taxpayer is fortunate that nature had performed the fragmentation for him, but the fragmented material is still quartzite."

In C.I.R. v. Quartzite Stone Co., 10 Cir., 273 F.2d 738, the Court affirmed a decision of the Tax Court which had classified the taxpayer's deposit as quartzite. The deposit was quite similar to that of the instant case in that it was a rock which was removed by dynamite and conveyed to a crusher where it was reduced to various sizes. (For a description of the deposit and processes, see 30 T.C. 511.) The Court, in affirming the classification made by the Tax Court, stated (at page 739):

> "We believe it to have been the intent of Congress to have used the term quartzite in an unrestricted sense and to have set a 15 per cent depletion allowance whenever the mineral was accepted commercially as quartzite."

As noted, the government here advances the theory that plaintiff's deposit, if not sand, was stone. No such contention was made in the trial Court and there is no evidence to support it. Recognizing that sandstone is not a mineral named in the statute, it is contended that it should be included in the general designation of "stone," which is classified in the statute as a mineral. As we understand the testimony of the geologists, sandstone is not a mineral but a type of rock formation in which a number of minerals may be found, including quartzite. The government in its brief appears to so recognize. It states, "The taxpayer's mineral deposit is located in the St. Peter sandstone formation and is composed almost entirely (98.40%) of quartz, or silica." There is good reason to believe that the failure of Congress to classify sandstone as a mineral was be-

cause it did not recognize it as such. The government concedes that plaintiff is entitled to a depletion allowance of 5% but argues itself into the anomalous position that plaintiff's deposit is sandstone, which is not classified in the statute as a mineral upon which any depletion is allowable.

■ We find no occasion to discuss other arguments advanced by the government, particularly that based upon the legislative history of the depletion statute. They have all been considered but do not change our conclusion that the District Court properly classified plaintiff's mineral deposit as quartzite under the relevant provision of the Revenue Code, subject to a depletion rate of 15%. Its judgment in that respect is affirmed.

This brings us to the more troublesome question as to the base (gross income) upon which taxpayer was entitled to calculate its depletion allowance. Section 114(b) (4) (B) of the Internal Revenue Code of 1939 [1] provides in part:

"The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *."

We have heretofore stated and need not repeat the treatment processes applied by the taxpayer in order to obtain a commercially marketable product. It is the government's position that the depletion base is the value of the crude unwashed silica sand which the taxpayer obtained from the deposit. The taxpayer contends and the District Court so held that its depletion base was its gross income from the sale of silica sand and flour in bulk and in bags. We do not agree with either contention. We think that the proper

depletion base lies at some point between what the government concedes and the taxpayer claims.

The government contends that United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581,[2] is conclusive on this issue. We agree that the decision of the District Court in the instant case is at variance with the rationale of that case, but we do not agree on the record before us that Cannelton supports the government's contention that the proper depletion base was limited to the value of crude unwashed silica sand. In that case, a producer of fire clay and shale processed those minerals into sewer pipe and claimed that since it could not profitably market the crude fire clay and shale because of its high-cost underground mine, its depletion base was the gross receipts from the sale of finished clay products. The Supreme Court's reason for reversing this Court, if it can be stated in a single sentence, was the interpretation which we placed upon the statutory term, "commercially marketable mineral product." This Court held that the term meant "a product which can be sold by it [the miner] at a profit." [268 F.2d 336.] The Supreme Court disagreed and held (364 U.S. at page 86, 80 S.Ct. at page 1586) that miners were entitled to a depletion allowance "based on the constructive income from the raw mineral product if marketable in that form."

Leaving Cannelton for the moment, we turn to the findings in the instant case. The Court found, based on a stipulation of the parties, the total shipments of silica made by the plaintiff during the taxable years, showing for each the tons of ground and unground silica, including the tons of both shipped in bags. We refer to the year 1952 as typical. In that year, plaintiffs shipped silica sand (Not Ground) in the amount of 217,854 tons, of which 42,107 tons were shipped in

1. Section 613(c) of the Code of 1954, so far as pertinent here, is substantially the same.

2. Cannelton reversed this Court, 7 Cir., 268 F.2d 334. Our decision was rendered June 15, 1959, that of the District Court in the instant case, May 31, 1960, and that of the Supreme Court in Cannelton, June 27, 1960.

bags. For the same year, plaintiff shipped silica flour (Ground Silica) in the amount of 58,735 tons, of which 32,-031 tons were shipped in bags. Thus, of the silica sand (Not Ground) shipped by plaintiff, about 20% was shipped in bags, and of the silica flour (Ground Silica), about 60% was shipped in the same manner. The government asserts, without dispute, that during the taxable years, over 60% of plaintiff's product was shipped in the form of bulk silica sand without either grinding or bagging.

The Court's conclusion that the taxpayer was entitled to employ as its depletion base gross income representing its entire receipts from the sale of silica sand and flour in bulk and in bags results from its findings 35, 36 and 37. Both the taxpayer and the government rely upon certain portions of these findings and each accuses the other of ignoring other portions. We think, therefore, that a sense of fairness dictates that they be stated *in toto*. · They are as follows:

"35. During the tax periods here in question, plaintiff processed a portion of its quartzite into silica sand by the application of the ordinary treatment processes normally applied by mine owners and operators in the silica industry having similar mineral deposits. During said tax periods, there was not any commercial market, within the market areas available to plaintiff, for any additional amounts of such silica sand nor was there any commercial market available to plaintiff for any product at any earlier stage of extraction and processing. The first commercially marketable mineral product derived by plaintiff from processing such portion of its quartzite was said silica sand ready for shipment at plaintiff's plant in bulk or in bags. Plaintiff sold all of said silica sand that it could market on a commercial basis for profit during said tax periods.

"36. During the tax periods here in question, plaintiff processed a portion of its quartzite into silica flour by the application of the ordinary treatment process normally applied by mine owners and operators in the silica industry having similar mineral deposits. Many of plaintiff's customers could use only ground silica. During said tax periods, there was not any commercial market, within the market area available to plaintiff, for any other product at any earlier stage of extraction and processing, except for the portion of its quartzite extracted and used by plaintiff in the processing of its silica sand. The first commercially marketable mineral product derived by plaintiff from processing such portion of its quartzite as was sold as silica flour was said silica flour ready for shipment at plaintiff's plant in bulk or in bags.

"37. The ordinary treatment processes applied by plaintiff to its quartzite, in order to obtain the first commercially marketable product, included the bagging of some of its silica sand and flour derived from said quartzite and the loading of its silica sand and flour at its plant either in bulk or in bags. Many of plaintiff's customers could use silica sand or silica flour only when shipped in bags, either because of lack of unloading facilities for bulk shipments or because of the particular end use of the product. During the tax periods here in question, plaintiff sold all the silica sand and flour derived from its quartzite in bulk which it could so market; and since there was not at any time during said tax periods any commercial market, within the market area available to plaintiff, for that portion of its silica sand and flour which was sold in bags other than in such containers, its first commercially marketable mineral product for that portion of its production was said portion of its silica sand and flour in bags."

We shall assume, in fact we think, the record supports these findings. The

question is whether they as a matter of law support the conclusion which the Court reached. We think they do not.

In summary, it may be noted that 35 relates to that portion of taxpayer's commercial product which it processed and sold as unground silica sand, representing all that could be sold at a profit. Finding 36 relates to that portion which was processed and sold as silica flour because some of taxpayer's customers could only use the product in that form. This, so it is stated, constituted the first commercial market for that portion of taxpayer's product. Finding 37 relates to that portion of silica sand and flour which could not be sold in bulk and which was shipped in bags, which for different reasons the taxpayer's customers could not otherwise use. This was the first commercial market, so the finding relates, for that portion of the taxpayer's product.

Thus, we are faced with the situation, recognized by the findings, that the taxpayer first obtained a commercially marketable product in the form of silica sand and, as already noted, over 60% of its product was shipped in the form of bulk silica sand without either grinding or bagging. The so-called treatment processes subsequently employed were to satisfy the demands of its customers for a more refined product, thereby increasing its sales and profits.

The Supreme Court in Cannelton, (364 U.S. at page 86, 80 S.Ct. at page 1586) referred to the fact that in Indiana three-fifths of the fire clay (the mineral there involved) was sold in its raw state, which indicated "a substantial market for the raw mineral." It then stated:

"This indicates that fire clay and shale were 'commercially marketable' in their raw state unless that phrase also implies marketability at a profit. We believe it does not. Proof of these sales is significant not because it reveals an ability to sell profitably —which the respondent could not do —but because the substantial tonnage being sold in a raw state provides conclusive proof that, when extracted from the mine, the fire clay

and shale are in such a state that they are ready for industrial use or consumption—in short, they have passed the 'mining' state on which the depletion principles operate."

■ We think this reasoning is applicable here. Certainly no rational theory is discernible as to why the taxpayer should be permitted to include its treatment processes beyond the point where it first obtained a marketable product; in fact, the situation in Cannelton was more favorable to the taxpayer than it is here. In that case, the taxpayer sold none of its product in its raw state because due to its high cost operation it could not compete at a profit with other producers. Even so, the Court determined its depletion base at the point where other producers sold the product in its raw state. Here, the taxpayer sold 60% of its product in the form of silica sand, without grinding or bagging. Thus, it is hardly open to question but that taxpayer's product at that point was ready for industrial use or consumption and had, in the language of Cannelton (364 U.S. at page 86, 80 S.Ct. at page 1587), "passed the 'mining' state on which the depletion principles operates."

The Supreme Court in Cannelton (364 U.S. at page 87, 80 S.Ct. at page 1587) stated:

"Ever since the first percentage depletion statute, the cut-off point where 'gross income from mining' stopped has been the same, i. e., where the ordinary miner shipped the product of his mine."

Taxpayer's formula, embraced by the District Court, determines as a base for depletion allowance the gross income received from the sale of taxpayer's product at all stages of processing. This encompasses not one but four cut-off points, (1) gross income received from the sale of unground silica sand in bulk (over 60%); (2) gross income received from the sale of unground silica sand in bags; (3) gross income received from the sale of silica flour (ground) in bulk, and (4) gross income received from the sale of

silica flour (ground) in bags. Such a result, in our view, is not supported by authority, sound reason or logic.

It is true, as previously shown, that the various processes employed by the taxpayer were those normally utilized by mine owners in the silica industry but it is also true that the Court in Cannelton relied upon the gross income received by the ordinary miner from the first substantial sales made of its product. In that case it was sales from the product in the raw state. In Cannelton, the taxpayer, for reasons peculiar to its own situation, made no sales of its product in its raw state, while such sales in substantial amounts were made by the ordinary miner. Thus, the taxpayer's depletion base was limited to the gross income received by the ordinary miner from such sales. In contrast, the taxpayer here sells in bulk more than 60% of its product without grinding or bagging. The fact that the ordinary miner, like the taxpayer, as to the remainder employs further processes in order to obtain a better or more salable product does not alter or move forward the cut-off point. This has been established by the taxpayer, as well as the ordinary miner who pursues the same course, at the point where it first sold substantial quantities of its product.

In our view, the decision of the Supreme Court in Cannelton which, as we have noted, was rendered after the decision of the District Court in the instant case, plainly teaches that the taxpayer's depletion base is the gross income it received from the sale in bulk of unground silica sand and what it would have received if all of its product had been sold in that form. Thus, the processes employed by taxpayer beyond that point must be excluded. This includes, on the facts of this case, the process of bagging its silica sand and flour. None of such processes was necessary "in order to obtain the commercially marketable mineral product."

Each party calls our attention to numerous cases which we need not cite or discuss. Mostly they are pre-Cannelton and any weight which they might otherwise carry has been largely dissipated by that decision. This is particularly true of cases dealing with the issue as to whether bagging is a process which may properly be included in determining the depletion base.

The government's contention that the depletable or first commercially marketable mineral product in the branch of the mining industry in which taxpayer was engaged was crude (unwashed) silica sand can be disposed of in short order. The government concedes that if the mineral be treated as quartzite, as we do, extraction, blasting, breaking with sledge hammers and spraying with water jets are allowable as treatment processes. It contends that the next process employed by taxpayer, that is, the washing of the crude sand, is not allowable. With this contention we do not agree. The Court made no finding which will support such a theory and, if such a finding had been made, it would have no substantial support.

The government relies upon the testimony of a single witness that one company during each of the taxable years in question sold considerable quantities of crude, unwashed sand to persons engaged exclusively in foundry work. It is doubtful that a crude sand operation is in the same branch of the mining industry as the taxpayer. The record reveals that there were fifteen producers of crude sand some thirty-three years ago, six such producers some eighteen years ago, and at the trial the government produced only one witness as to this character of operation. In any event, even though it be assumed that the crude sand operator is in the same branch of the mining industry as the taxpayer, it is our view that sales by a single operator do not furnish an appropriate basis for computing depletion. Certainly the proof relative to such an operation does not establish the processes used by the ordinary miner in producing a commercially marketable product.

The judgment is reversed and the cause remanded, with directions that taxpayer's

percentage depletion base be computed upon the basis of its receipts from the sale in bulk of its unground silica sand, and in such computation the fifteen per cent depletion rate applicable to quartzite be applied.