DOW CHEMICAL COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2207–66. Filed January 29, 1969.

*John F. Creed, David R. Macdonald, Dennis I. Meyer*, and *John P. Beukema*, for the petitioner.

*John H. Menzel* and *Joseph F. Dillion*, for the respondent.

WITHEY, *Judge:* Deficiencies have been determined by the Commissioner in the income tax of petitioner for the fiscal years ended May 31, 1957, and May 31, 1958, in the respective amounts of $594,-030.02 and $903,822.19. By an amended answer, the Commissioner now claims an increased deficiency for such fiscal years in the respective amounts of $1,148,193.75 and $1,436,834.62. Petitioner claims an overpayment of such tax for each of such fiscal years in the respective amounts of $385,905.66 and $348,665.38. Due to concessions made by respondent in his amended answer and also upon brief, and by petitioner in its opening statement, the primary issue before us for decision is whether the cutoff point for the computation of petitioner's gross income from mining for the purpose of its percentage depletion allowance is the value of its brine at the wellhead. In the alternative, should we find to the contrary, are the processes used by petitioner to obtain bromine, magnesium hydroxide, magnesium chloride, sodium chloride, calcium chloride, and potash from brine allowable ordinary treatment processes under section 613 of the Internal Revenue Code of 1954? Petitioner's claim for refund arises because of its failure to deduct a depletion allowance for either year with respect to magnesium hydroxide used by it in the manufacture of epsom salts. All agreed adjustments will be given effect under Rule 50.

### FINDINGS OF FACT

The facts which have been stipulated are found accordingly.

Petitioner is a Delaware corporation with its principal office at the time the petition was filed at Midland, Mich. It is engaged in the mining of crude minerals and the manufacture and sale of a diversified line of chemicals, as well as the manufacture and sale of metals and plastics. Its major product lines contributed to its total sales revenue in the following approximate percentages: Chemicals, 53 percent; plastics, 32 to 35 percent; magnesium, 7 to 9 percent; and agricultural chemicals, 6 percent.

Petitioner maintains its books on an accrual method of accounting. It filed its Federal income tax returns for the fiscal years ended May 31, 1957, and May 31, 1958, with the district director of internal revenue, Detroit, Mich.

Petitioner obtains brine from natural deposits located at Midland, Mich., and Ludington, Mich. At Midland, the natural brine is obtained from a formation known as sylvania sandstone. This sandstone formation is located approximately 5,000 feet below the surface of the earth and is about 100 feet thick. The sylvania sandstone is porous and the brine is found in the porous area of this formation.

At Ludington, the brine is found in a formation known as the filer sandstone, which is also porous, with the brine being contained in the pores. The filer sandstone formation is located approximately 2,800 feet below the surface of the earth and the formation fluctuates in thickness and porosity.

Petitioner obtains brine by drilling wells into the particular formation. When the well is drilled into the formation, the brine rises part way up the well casing. A pump is installed to pump the brine the rest of the way to the surface. During the years 1957 and 1958, the petitioner was operating 60 producing wells in the Midland area and 16 producing wells in the Ludington area. Other wells in each area were used as repressuring wells to maintain the brine field's pressure.

The 16 producing wells in the Ludington area were drilled in approximately 1942. At Midland, the 60 wells were drilled beginning in 1938. By 1944, 10 of the 60 wells were in production. The remaining wells were drilled during the intervening years.

All of the brine wells at Midland are connected to a pipeline gathering network in which the brine is pumped to the bromine plant. As the brine emerges from the ground, it is a liquid solution with a temperature of approximately 95° F. The brine solution is a fully saturated solution containing approximately 70-percent water and 30-percent solids which have been dissolved in the brine solution. The dissolved solids are all in the brine in the form of hydrated ions.

A representative analysis of the composition of the brine by weight is as follows:

|  | Percentage by weight | |
| Cations | Ludington | Midland |
| --- | --- | --- |
| Ca | 6. 272 | 7. 27 |
| Mg | 2. 506 | 0. 93 |
| Na | 1. 141 | 2. 19 |
| K | 0. 488 | 0. 87 |
| Sr | 0. 177 | 0. 29 |
| $NH_4$ | 0. 0117 | 0. 0443 |
| Fe | 0. 0036 | 0. 0030 |
| Anions | | |
| Cl | 20. 69 | 20. 0 |
| Br | 0. 2446 | 0. 2864 |
| I | 0. 0003 | 0. 0040 |
| $SO_4$ | 0. 0025 | 0. 0048 |
| $BO_3$ | 0. 028 | 0. 16 |

The balance of weight is water.

During the year 1957, the petitioner pumped 3,329,907 thousand gallons of natural brine from its deposits at Midland and Ludington, Mich., and during 1958, 3,055,357 thousand gallons.

At both Midland and Ludington, all of the natural brine pumped is processed for its bromine content.

At Midland, approximately 10 percent of the brine solution is further processed after it leaves the bromine plant, the remaining 90 percent after leaving the bromine plant being pumped back to the ground for repressurizing purposes.

At Ludington, approximately 30 to 50 percent of the brine solution is further processed after it leaves the bromine plant.

At Midland during the years in issue, the natural brine was processed to obtain the following minerals: Bromine, sodium chloride or salt, potassium chloride (potash), calcium chloride, and magnesium hydroxide. At Ludington during the years in issue, the natural brine was processed to obtain the following minerals: Bromine, magnesium chloride, magnesium hydroxide, and calcium chloride.

It is stipulated by the parties and we find as follows with respect to petitioner's method of determining gross income from its mining during the years at issue:

1. *Bromine.*—F.o.b. plant price obtained for elemental crude bromine was used for computing gross income for depletion purposes on all bromine produced. Bromine used by Dow for the production of purified bromine in ethylene dibromide and other bromides was priced at the elemental crude bromine price for depletion purposes.

2. *Calcium Chloride.*—The price for 100-pound bags of calcium chloride flake was used in calculating gross income for depletion purposes on all calcium chloride flake sold in packages and on all grades of calcium chloride which sell for a higher price than flake. In the case of calcium chloride liquor sold for less than the 100-pound-bag price, the actual sales price was used in computing gross income for depletion purposes. In the case of calcium chloride pellets produced at Ludington, the 100-pound-bag price for pellets was used to compute gross income for depletion purposes on all calcium chloride sold from Ludington. In 1957 and 1958, the quantity of calcium chloride sold was not reduced by the amount of calcium chloride attributable to lime added in the process before calculating gross income for depletion purposes.

3. *Magnesium Chloride.*—All magnesium chloride sold was priced at the price of the largest package for the purpose of computing gross income for depletion.

4. *Magnesium Hydroxide.*—Magnesium hydroxide was priced at the sales price. Petitioner has determined that the correct basis for

calculating gross income from mining on magnesium hydroxide is to use the price of magnesium hydroxide slurry on all magnesium hydroxide sold, including magnesium hydroxide which is dried and packaged. In the years in issue, the sales of both magnesium chloride and magnesium hydroxide were not reduced by the amount of magnesium attributable to the lime added in the process before calculating gross income for depletion purposes because the magnesium as obtained was not a material amount, but in later years when do-lime was used, the price was so reduced, resulting in a subsantial reduction in gross income for depletion.

5. *Magnesium Hydroxide Used to Produce Epsom Salts.*—Petitioner neglected to claim depletion on the magnesium contained in epsom salts in 1957 and 1958, but later filed claims for refund. The calculation for gross income for epsom salts was somewhat complicated but petitioner now agrees that gross income should be determined by the amount of magnesium hydroxide used to produce epsom salts with the magnesium hydroxide being priced at the slurry price charged by petitioner. When petitioner's actual depletion calculations did not agree with the procedures described above, adjustments were made in connection with the income tax audit to make the gross income figures conform to the procedure.

6. *Potassium Chloride.*—Gross income for depletion purposes on potassium chloride was based on the actual sales price of potassium.

The following describes the processes employed by petitioner in obtaining the various minerals from its natural brine deposits located in Ludington and Midland.

### Ludington Processes

### Bromine

Bromine is obtained from the brine in the following manner: The brine, containing approximately 0.25-percent bromide, is pumped from a central storage tank through a heat-exchange apparatus to the chlorinating tower, which is a cylindrical steel tank lined with acid-resistant brick and filled with an inert packing. Chlorine gas and a small amount of hydrochloric acid are added to the brine. The hydrochloric acid is added to economize on the consumption of chlorine in the process. From the chlorinating tower the brine so treated is fed by gravity to a "steaming-out tower," a similarly lined and packed cylindrical tank. There, through the addition of steam, the bromine is vaporized and separated from the brine.

Steam is used in this process as an inert gas. Any inert vapor will separate the bromine from the brine if percolated through it. Steam cannot exist as a vapor in the brine at atmospheric pressure until the

temperature of the brine attains approximately 100° C. The steam itself is the sole input of heat in the bromine process. The heat-exchange apparatus is an economy measure which serves to reduce the amount of steam which must be absorbed by the brine before steam escapes as a vapor. Air may also be used to bubble bromine from the brine and was in fact used in 1957 and 1958 with respect to a small portion of the bromine obtained in Midland. During these years, when air was used, the process was run at the normal prevailing temperature. An advantage of using steam was that large volumes of vapor condense into minor quantities of water, thereby simplifying the collection of the bromine.

The mixture of steam and bromine vapor is then condensed and the water separated from the bromine by a gravity phase separation. The water layer is sent back to the steaming-out tower and the bromine layer is sent to a chlorine stripper where the chlorine which was carried along by the steam is removed as a vapor and recycled. Some bromine comes off along with the chlorine and goes through the steaming-out process again.

The resulting material, bulk elemental bromine, technical grade, a brownish liquid approximately three times as dense as water, can be shipped in lead-lined tank cars. None of the bromine is processed further at Ludington.

If the chlorine were added to the brine and the brine allowed to stand in an open tank, much of the bromine would vaporize at the surface and gradually escape the brine, but the process would be too slow. The purpose of the steaming-out tower is to increase the rate of bromine vaporization and thereby to improve the efficiency of the extraction. When an inert gas is bubbled through the brine, the surface area of brine in contact with the vapor phase is greatly increased and the separation occurs more quickly.

### Magnesium Hydroxide

Magnesium hydroxide is the first magnesium material obtained by petitioner from its natural brine deposit at Ludington. The Ludington brine, with its bromine content removed, is pumped to one of several large vats equipped with an agitator. Slaked lime in slurry form is added to the brine and magnesium hydroxide precipitates forming a slurry of magnesium hydroxide particles. The magnesium hydroxide slurry is pumped through a filter cloth. The magnesium hydroxide forms a white cake on the filters which is washed and periodically removed and either dried or put into slurry form for shipment. Magnesium hydroxide is not obtained by petitioner in any process utilizing magnesium chloride as an intermediate step.

## Calcium Chloride

Calcium chloride is obtained from the clear filtrate coming from the magnesium hydroxide filter. The filtrate, or liquor, consists chiefly of calcium ions, sodium ions, and chloride ions.

The liquor is then concentrated by evaporation. In the course of this concentration, sodium chloride is formed by crystallization, removed, and discarded. The liquor is further evaporated, pelletized, and dried, resulting in 94-percent calcium chloride pellets.

## Magnesium Chloride

Magnesium chloride is obtained from the brine through the following process: Brine from the bromine facility is pumped to a carbonation tank where carbon dioxide and magnesium hydroxide are added. The magnesium hydroxide is dissolved to magnesium ion in solution as the calcium carbonate is formed. Calcium carbonate precipitates as a solid and separates from the brine. The remaining liquid is filtered to remove the calcium carbonate, which is a waste product, and is then evaporated.

In the course of evaporation, sodium chloride crystallizes and is removed from the liquid. The remaining magnesium chloride is further evaporated and solidified as flakes on large revolving drums.

### *Midland Processes*

## Bromine

The bromine is obtained from the Midland brine by the same process as that used in Ludington, with the exception that no hydrochloric acid is added.

## Sodium Chloride

Petitioner obtains sodium chloride from the natural brine by evaporation. As the brine becomes more concentrated, sodium chloride crystallizes and is separated from the remaining liquor.

## Potassium Chloride

Potassium chloride is obtained from the concentrated liquor remaining after the removal of sodium chloride. This liquor is cooled by refrigeration. Crystals of the double salt, "carnallite," form during this cooling. These crystals contain a major portion of the potassium ion present in the liquor. The crystals are separated from the liquor by filtering and treated with water to remove the magnesium chloride content of the carnallite by dissolution. The remaining potassium chloride is filtered, dried, and sold by petitioner, as bulk, crude, crystalline potassium chloride.

## Magnesium Hydroxide

Petitioner obtains magnesium hydroxide at Midland for use in producing epsom salts by the following process: Slaked lime is added to the concentrated liquor from the "carnallite crystallization," and magnesium hydroxide separates as a solid from the liquor. The resulting slurry is concentrated by filtration and washed, and is then ready for use in the production of epsom.

Petitioner, as well as other extractors of minerals from natural brines, on occasion obtained such brines from each other, or from oil producers. These transactions may be summarized as follows:

| Parties to agreement | Time period | Characterization of arrangement |
| --- | --- | --- |
| Great Lakes Chemical Corp.—Standard Lime & Cement Co. | 1944 | Joint exploitation of a single mineral deposit. These transactions represent various cost-sharing arrangements whereby Great Lakes and Michigan Chemical extracted the bromine, and Standard Lime the magnesium compounds contained in certain brine deposits located in Manistee, Mich. |
| Standard Lime & Cement Co.—Great Lakes Chemical Corp. | 1952–55 | |
| Michigan Chemical Corp.—Standard Lime & Cement Co. | 1952–55 | |
| Standard Lime & Cement Co.—Michigan Chemical Corp. | 1955–66 | |
| Great Lakes Chemical Corp.—Standard Lime & Cement Co. | 1955–60 | |
| Standard Lime & Cement Co.—Great Lakes Chemical Corp. | 1961–66 | |
| Murphy Oil Co.—Michigan Chemical Corp. | 1957–65 | Joint venture between Murphy Oil and Michigan Chemical to exploit the bromine-bearing brine produced as a byproduct of Murphy's oil production. Murphy Oil's charges for brine were a mechanism to share the costs of bromine production with Michigan Chemical. |
| Parnell, Inc.—Arkansas Chemical Corp. | 1961–66 | Sale of brine by Parnell to Arkansas Chemical, a corporation engaged in bromine extraction. |
| Dow Chemical Co.—various oil companies in Michigan. | 1934–53 | Transfers without consideration by the oil companies to Dow of brine obtained as a waste product of the oil production in the Midland, Mich. area. Dow, at its own expense, gathered the brine and transported it by pipeline to its bromine plant in Midland. |
| Dow Chemical Co.—various oil companies in California. | ---------- | Various arrangements with oil producers in California whereby Dow obtained the brine produced incidental to the oil production. In effect, the essence of those agreements was brine "disposal" by the oil companies, required by California law. In some instances, Dow received the brine without charge, while in others it was paid a fee to take the brine or itself paid nominal royalties for it depending on who bore the cost of its transportation. |

In no instance were such brines used for a purpose other than the extraction of minerals therefrom. The minerals contained in such transferred brines were not, while in solution therein, fit for industrial use or consumption, nor were such minerals commercially marketable in that condition. Such minerals were not ready for shipment prior to their extraction from the brine.

#### ULTIMATE FINDINGS

Petitioner is a miner of bromine, magnesium hydroxide, magnesium chloride, calcium chloride, sodium chloride, and potash, but is not a miner of brine.

The brine pumped from wells by petitioner is not a depletable substance, but is an ore of the minerals above set forth, which are depletable substances.

The processes applied to its brine by petitioner are used solely for the purpose of extracting such minerals from their ore and are not used at any point thereafter.

Brine pumped by petitioner is not a commercially marketable or industrially usable product of its mining.

## OPINION

Respondent's primary contention is that the natural brine produced by petitioner is ready for industrial use and is commercially marketable at the wellhead and therefore the cutoff point for computation of its depletion allowance is at that point. Upon this premise, respondent contends that none of the processes used by petitioner to obtain the minerals here in controversy are allowable ordinary mining processes under section 613.[1]

---

[1] SEC. 613. PERCENTAGE DEPLETION.

(a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

(b) PERCENTAGE DEPLETION RATES.—The mines, wells, and other natural deposits, and the percentages referred to in subsection (a) are as follows :

\* \* \* \* \* \* \*

(5) 5 percent—

\* \* \* \* \* \* \*

(B) if from brine wells—bromine, calcium chloride, and magnesium chloride.

(6) 15 percent—all other minerals (including, but not limited to, aplite, barite, borax, calcium carbonates, refractory and fire clay, diatomaceous earth, dolomite, feldspar, fullers earth, garnet, gilsonite, granite, limestone, magnesite, magnesium carbonates, marble, phosphate rock, potash, quartzite, slate, soapstone, stone (used or sold for use by the mine owner or operator as dimension stone or ornamental stone.) thernardite, tripoli, trona, and (if paragraph (2)(B) does not apply) bauxite, beryl flake graphite, fluorspar, lepidolite, mica, spodumene, and talc, including pyrophyllite), except that, unless sold on bid in direct competition with a bona fide bid to sell a mineral listed in paragraph (3), the percentage shall be 5 percent for any such other mineral when used, or sold for use, by the mine owner or operator as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes. For purposes of this paragraph, the term "all other minerals" does not include—

(A) soil, sod, dirt, turf, water, or mosses ; or

(B) minerals from sea water, the air, or similar inexhaustible sources.

(c) DEFINITION OF GROSS INCOME FROM PROPERTY.—For purposes of this section—

(1) GROSS INCOME FROM THE PROPERTY.—The term "gross income from the property" means, in the case of a property other than an oil or gas well, the gross income from mining.

(2) MINING.—The term "mining" includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in

In support of his contention, respondent relies nearly entirely upon *United States* v. *Cannelton Sewer Pipe Co.*, 364 U.S. 76. We think in doing so he misreads that case. In *Cannelton*, the material brought to the surface of the taxpayer's mine and found by the Court to be its first-obtained commercially marketable or industrially usable product of its mining was raw fire clay and shale, the whole of which was used by the taxpayer to produce sewer pipe. Here the brine brought to the surface by petitioner is used solely for the extraction of the minerals here at issue, after which the brine, still 50 to 90 percent in volume of its volume at the wellhead, is returned to petitioner's wells to maintain their pressure. Thus, in *Cannelton*, the material brought to the mine entrance was usable in its entirety by the taxpayer in the fabrication of manufactured products, while here only the minerals after their extraction from the brine were suitable for use in manufacturing, e.g., magnesium hydroxide into epsom salts. Where so used, petitioner claims no depletion other than it claims for the same mineral sold to customers.

Another feature distinguishing the instant case from *Cannelton* relates to the processes applied to the particular material involved. In *Cannelton*, the process held not allowable was the fabrication of fire clay and shale into vitrified sewer pipe, *id.* at 78, a process nowhere found in section 613. In the instant case, the challenged processes are

---

excess of 50 miles unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills.

(3) EXTRACTION OF THE ORES OR MINERALS FROM THE GROUND.—The term "extraction of the ores or minerals from the ground" includes the extraction by mine owners or operators of ores or minerals from the waste or residue of prior mining. The preceding sentence shall not apply to any such extraction of the mineral or ore by a purchaser of such waste or residue or of the rights to extract ores or minerals therefrom.

(4) ORDINARY TREATMENT PROCESSES.—The term "ordinary treatment processes" includes the following:

(A) in the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment;

(B) in the case of sulfur recovered by the Frasch process—pumping to vats, cooling, breaking, and loading for shipment;

(C) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment;

(D) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores; and

(E) the pulverization of talc, the burning of magnesite, and the sintering and nodulizing of phosphate rock.

those extractive processes specifically enumerated in the statute as allowable under section 613(c)(4)(D).[2]

We conclude from the above distinguishing features that had the Supreme Court been faced with the factual and legal situation before us it would have determined that whether brine, as an ore, was commercially usable was of no materiality, but that the question of fitness for commercial or industrial use as it relates to ores or minerals which are not customarily sold in the form of the crude mineral product has application only to the product of mining after the product's permissible extraction from its ore, section 613(c)(4)(D), in this case, the extracted minerals bromine, magnesium hydroxide, calcium chloride, magnesium chloride, sodium chloride, and potash. We so hold. We do not read *Cannelton* to say that had the taxpayer there found its clay and shale in a bed of fill-dirt, which is certainly commercially usable, but at the same time, a waste material to that taxpayer, such utility would mark a cutoff point for the depletion allowance and we likewise do not take that case to mean that the commercial usage of petitioner's brine, as distinguished from the minerals it contained, would mark its cutoff point. We doubt that the crushed ore in gold, silver, or other such mining, even though found to be ready for some industrial use, would mark the cutoff point for such miners.

In any event, respondent's evidence offered to establish that petitioner's brine at the wellhead was ready for industrial use falls short of doing so. The only use to which brine is shown to have been put by such evidence is the extraction of minerals by petitioner and others. In most cases, with the possible exception of petitioner, a single mineral of the several contained in brine was extracted by a contracting party, the remaining brine then being either reconveyed to the other party for the extraction of a different mineral or disposed of as waste. Such use seems to us the mere joint mining of an ore derived from a single source. All parties to such contracts were extractors of minerals from a brine ore. In a single instance, such evidence discloses a contract whereby brine was pumped from wells and delivered by pipeline a short distance to the extracting plant of a mineral producer. The pumping and delivery was performed by a nonproducer of minerals who was paid for his services by receiving title to a percentage of the minerals produced in kind. At the close of the first year of such operation, the contract was terminated by the extractor and no further pumping of brine from such wells has been done by the pumper. There was no remaining market for such brine. In our view,

---

[2] Respondent argues summarily that the applicable subsection is (c)(4)(C). However, we find the brine of petitioner was an ore "not customarily sold in the form of a crude mineral product," and, therefore, (c)(4)(D) is the applicable subsection. As to whether petitioner's processes are permissible under that subsection, see pp. 681–684, *infra*.

the substance of the above arrangements amounted to no industrial usage of brine (except possibly as a vehicle for its mineral content) but instead amounted to the furnishing of an ore to extractors of the mineral burden thereof.

Furthermore, as we see it, if respondent is correct in his contention that brine, because it serves as the source of the minerals extracted therefrom, is ready for a commercial or industrial use, i.e., extraction of minerals, and therefore, is to be the cutoff point for depletion purposes, there can be no depletion of any such minerals derived from brine upon the value thereof subsequent to the pumping of the brine from the wellhead, no matter whether the extraction processes used to obtain the minerals therefrom are or are not allowable under the statute. This we think was never intended by Congress nor is it a proper interpretation of *Cannelton*, for to so hold would render section 613(b)(5)(B) meaningless unless it was also shown that the processes of such extraction were at least in part not allowable under section 613. Cf. *Dravo Corporation* v. *United States*, 348 F. 2d 542 (Ct. Cl. 1965).

Another test for the determination of fitness for commercial or industrial use is whether or not the mined product is ready for shipment. In the first place, the "mined product" here is not the brine from petitioner's brine wells but is rather the minerals the brine contains. These minerals in solution in the brine are not ready for shipment to anyone who would be a user of such minerals. They must first be extracted from the brine and processed to their individual shipping forms. While it is economically possible to transfer brine for short distances by pipeline for the extraction of its mineral content, it is unreasonable to contend that to do so would be an economic feasibility so far as shipment of the minerals therein is concerned. The fact that in volume, 50 to 90 percent of petitioner's brines is waste material is enough to demonstrate that the "ready for shipment" test shows rather conclusively that the depletable minerals here involved are not ready for commercial or industrial use while in the brine at the wellhead.

We are also concerned with the wording of the language of the Supreme Court in *Cannelton* with respect to the phrase "fit for industrial or commercial use" in fixing the cutoff point for depletion. We note that in *Cannelton* the phrase is used by the Court in connection with a product of mining which was in its entirety used to *manufacture* an article. Having been so employed, we think the word "use" does not describe the employment of brine by petitioner or others who were parties to the brine agreements referred to above. Neither petitioner nor any other of such contracting parties made a use of brine in that sense. The evidence indicates that all known extractors of

minerals from brine used virtually the same extraction processes during the years at issue. It follows that the only office of the brine in these processes was, to the extent of from 50 to 90 percent thereof, as a mere vehicle for the carrying in solution of minerals to be removed therefrom. The thrust of *Cannelton* is that processes used by an integrated miner-manufacturer upon a mined material are allowable in computing gross income for depletion purposes only to the point where *mining* ceases and *manufacturing* begins. The "use" it refers to is necessarily a business or trade use other than "mining," as that term is defined by statute.

We hold that petitioner's natural brine at the wellhead is not the cutoff point for computation of its gross income from the mining of the minerals here in controversy.

The next question to be decided is: Are the processes used by petitioner in arriving at its basis for computation of percentage depletion permissible as ordinary treatment processes under section 613? As previously determined, footnote 2, *supra*, the relevant subsection is (c) (4) (D) since the brine of petitioner was ore "not customarily sold in the form of a crude mineral product." In arguing that petitioner's processes are not statutorily authorized, respondent relies heavily upon the following language from *United States* v. *Cannelton Sewer Pipe Co.*, *supra* at 85:

none of the permissible processes destroy the physical or chemical identity of the minerals or permit them to be transformed into new products.

We think respondent has too broadly applied the above language. At the time *Cannelton* was being written, the controlling statute, sec. 114(b) (4), I.R.C. 1939, provided permissible processes for the mining of several minerals, which, while in place, were as is here largely the case, in an indiscrete ionic form as chemical compounds. For instance, to extract minerals such as silver and copper from their ores, miners were then ordinarily using various processes specifically permitted by statute or regulation which resulted in silver and copper in their non-ionic elemental form. The resulting silver and copper were both chemically and physically different in their atomic structure than was their condition in place in their respective ores. Furthermore, it must be remembered that at the writing of *Cannelton*, the predecessor present section 613(b) (5) (B) existed in identical form. It provided that if three specified minerals were obtained from brine wells, the depletion rate for each would be 5 percent. These three minerals, bromine, calcium chloride, and magnesium chloride (all of which are in controversy here) are, while in solution in brine, in an ionic form, both physically and chemically different from the mineral resulting from ordinary permissible processing. It is our conclusion that the Supreme Court was aware of that fact when it used the above language,

and that Congress was aware of the same fact when it was reenacting the provision in that section of the 1954 Code.[3]

Even though respondent states his position as the proposition that petitioner's processes are not permissible because they result in physical or chemical change, as we read his brief, we think he is in actuality merely contending that because there is this change it therefore necessarily follows that a *manufacturing* rather than a *mining* action has been effectuated by those processes. We have two responses to this argument. First, certain extraction processes, even though resulting in physical and/or chemical change, are specifically designated by section 613(c)(4)(D) as mining processes when used to extract a mineral from its ore. In fact, respondent's regulations in force in the years at issue provide that a treatment effecting a chemical change is not included in the term "ordinary treatment processes" *unless* that process is otherwise provided for in the statute, or is necessary and incidental to a process so provided in section 39.23(m)–1f(2) (i) and (ii), Regs. 118. Thus, respondent's own regulations recognize that a chemical change may be involved in an "ordinary treatment process" so long as the process is one provided for in the statute. The record here clearly indicates the processes used by petitioner were such processes and used only for extraction purposes. Secondly, section 613(b)(5)(B) must be read not only as an indication of the depletion percentage to be allowed with respect to the three minerals there enumerated when obtained from brine wells, but it must also be read as a clearly implied intendment by Congress that even though the minerals as they exist in brine are chemically and physically different from the result of the use of permitted processes, they still retain their identity as mined products within the meaning of section 613.

Finally, the Supreme Court's language in *Cannelton* does not prohibit processes which bring about physical or chemical *change*. It prohibits processes which "*destroy* the physical or chemical *identity* of the minerals.*" (Emphasis added.) By necessary implication it holds that the allowable processes enumerated in both section 613(c)(4)(C) and (c)(4)(D) do not "destroy the physical or chemical identity of the

---

[3] The congressional history of sec. 613 and its predecessors is too voluminous to document here. Suffice it to say that beginning with art. 221(g), Regs. 77, a nearly continuous attempt has been made by that and subsequent regulations to limit permissible extraction processes to those which do not involve physical or chemical change of the mineral in place. Numerous hearings have been held by committees of both Houses in which representatives of various mining industries have made it clear that such changes do ordinarily take place in the extraction of a majority of the minerals listed in what is now sec. 613(c)(4)(D). See, for instance, Hearings on the Revenue Act of 1943, 78th Cong., 1st Sess., p. 527; Senate Special Committee on the Investigation of Silver, 77th Cong., 2d Sess., p. 858. Such hearings resulted in the Revenue Act of 1943, which provided virtually the same provisions for the 1939 Internal Revenue Code (sec. 114(b)(4)) as they exist in sec. 613(c)(4) of the 1954 Code in the form controlling in the years at issue, 1957 and 1958.

minerals" despite the fact that many of such processes produce both physical and chemical *change* in minerals during their extraction from their ores.

Among the allowable processes under section 613(c)(4)(D) are beneficiation by concentration, cyanidation, leaching, crystallization, and precipitation. We find that petitioner herein utilized these processes, or their equivalents, in its extraction of depletable minerals from brine.

The evidence before us shows clearly that with respect to the bromine extracted by petitioner, it is in an ionic state in combination with other chemicals while in solution in the brine.[4] This brine is transported directly from the wells to petitioner's bromine extraction plant, where chlorine gas is introduced to effectuate a chemical replacement of the bromide ion by the gas. At petitioner's Ludington plant, hydrochloric acid is also added at this point to economize on the consumption of chlorine. This process has not separated the bromide ion from solution, but has prepared it so that with the addition of steam, bromine is actually separated from the brine by vaporization. Bulk elemental bromine, technical grade, results. We find that the vaporization process used by petitioner is the equivalent of precipitation and crystallization and is an allowable process under section 613(c)(4)(D).

Magnesium hydroxide is obtained from the brine by petitioner subsequent to the extraction of bromine therefrom. Lime is added to the debrominated brine to form a slurry from which magnesium hydroxide precipitates. The precipitate is then washed. This product is not sold by petitioner for use as riprap, ballast, road material, rubble, concrete aggregates, or other similar uses. The lime used as above indicated contains some magnesium, which supplies less than 1 percent of the total amount of magnesium contained in the magnesium hydroxide obtained by the above process. We find that the process used by petitioner to obtain magnesium hydroxide is the allowable process of "precipitation" and petitioner is entitled to depletion on that portion of magnesium hydroxide which is not attributable to the magnesium added in the lime.

Calcium chloride is extracted from brine by petitioner by a process of evaporation during its extraction of magnesium hydroxide therefrom. Evaporation is the equivalent of precipitation and is an allow-

[4] We note that bromine does not exist in nature in its elemental non-ionic form and therefore may be obtained from brine only by processes deliberately designed to effectuate an electron transfer from a bromide in solution to a chloride ion. Bromine while in solution in petitioner's natural brine as a bromide possesses one extra electron. This electron is transferred by the addition of chlorine gas which results in the preparation for separation of the bromine from solution either by the introduction of air or steam. This process was the ordinary method used by extractors of bromine from brines when the predecessor to sec. 613(b)(5)(B) was enacted authorizing a 5-percent depletion allowance for bromine when obtained from brine wells.

able process under section 613(c)(4)(D). A portion of the calcium chloride obtained is attributable to the calcium content of the added lime above mentioned. Petitioner is not entitled to a depletion allowance with respect to that portion and claims none.

Magnesium chloride is extracted by petitioner from the debrominated brine by a combination of precipitation, filtering, crystallization, and evaporization. This combination of processes is allowable under section 613(c)(4)(D). The record is unclear on the point, but it appears to us that a portion of the magnesium chloride petitioner extracts is attributable to the magnesium contained in the lime added by petitioner during processing, and as to that portion, petitioner is entitled to no depletion allowance.

Sodium chloride is extracted from the brine by petitioner by a combination of evaporation and crystallization which are allowable processes under section 613(c)(4)(D).

Potassium chloride is potash, which is listed as an example in section 613(c)(4)(D). It is extracted by petitioner from the "liquor" which remains after removal of the sodium chloride from the brine. This liquor is refrigerated causing a crystallization of carnallite, which contains a major portion of the potassium ion present in the liquor. These crystals are filtered from the liquor and treated with water to remove the magnesium chloride content of the carnallite, leaving remaining only potash. The potash is filtered, dried, and sold by petitioner as bulk, crude, crystalline potassium chloride. The processes used are crystallization and leaching, which are allowable processes under section 613(c)(4)(D).

As noted above, petitioner claims a depletion allowance with respect to that portion of the magnesium hydroxide it extracts which it uses to produce epsom salts.[5] It took no deduction therefor in the years at issue. As a result, it now claims an overpayment based upon the sales price of magnesium hydroxide slurry. We find that petitioner is entitled to a depletion allowance with respect to such magnesium hydroxide computed on the basis of its sales price for magnesium hydroxide slurry, reduced by the portion thereof attributable to the added lime.

In sum, we hold that petitioner's gross income from mining for each of the minerals in controversy is its sales price for each, with the adjustments noted where a portion of such minerals is attributable to added ingredients.

*Decision will be entered under Rule 50.*

---

[5] Petitioner makes no claim for depletion based on the value of any of the epsom salts it produced. Rather, petitioner's claim is for depletion based on the value of the magnesium hydroxide it extracts, which is then used to produce the epsom salts.