**CANNELTON SEWER PIPE COMPANY,**
Plaintiff-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellant.

No. 12496.

United States Court of Appeals
Seventh Circuit.

June 15, 1959.

Charles K. Rice, Asst. Atty. Gen., Melva M. Graney, Atty., U. S. Dept. of Justice, Washington, D. C., Don A. Tabbert, U. S. Atty., Indianapolis, Ind., Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson, Marvin W. Weinstein, Attys., Dept. of Justice, Washington, D. C., John C. Vandivier, Jr., Asst. U. S., Atty., Indianapolis, Ind., for appellant.

Howard P. Travis, Indianapolis, Ind., Royse & Travis, John A. Royse, Thomas A. Hendrickson, Indianapolis, Ind., of counsel, for appellee.

Before DUFFY, Chief Judge, and HASTINGS and KNOCH, Circuit Judges.

HASTINGS, Circuit Judge.

Taxpayer, Cannelton Sewer Pipe Company, brought this suit in the district court for a refund of income tax paid in 1951. The sole question before us is what constitutes the proper basis for the computation of percentage depletion to which taxpayer is entitled. At all times relevant to this proceeding, taxpayer was engaged, near Cannelton, Indiana, in the mining of fire clay and shale and the manufacture of vitrified clay sewer pipe and related products. Under provisions of the Internal Revenue Code of 1939 [1] taxpayer was permitted a percentage depletion on its fire clay of 15% and, on its shale of 5% of "the gross income from the property during the taxable year * * *." 26 U.S.C.A. § 114(b) (4) (A) (1939 I.R.C.). The district court held that taxpayer could compute its deduction for depletion on the basis of its gross income from the sale of its finished products. The Government contends such holding is erroneous.[2]

---

[1]. Reference to "the Code" in this opinion will be to the Internal Revenue Code of 1939.

[2]. There was also before the trial court a question whether or not taxpayer's clay was "fire clay" but the Government has not taken issue in this appeal with the trial court's finding that taxpayer's product met the specifications of fire clay.

Section 114(b) (4) (B) of the Code provided, in pertinent part, that:

> "The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the *ordinary treatment processes normally applied by mine owners or operators* in order to obtain the *commercially marketable mineral product or products* * * *." (Emphasis added.)

It is taxpayer's position that the processes by which it produced vitrified sewer pipe and related products from its raw fire clay and shale qualify as "ordinary treatment processes" within the meaning of the above statutory language since it had no market for its minerals in crude form and such processes were of necessity applied by it in order to obtain the first commercially marketable products. The Government urges that, in 1951, there was an existing substantial market for raw fire clay and shale in Indiana and in the area surrounding taxpayer's mine; and, that, in light of this fact, raw fire clay and shale were taxpayer's first commercially marketable products.

Taxpayer contends that the sole question on this appeal is whether there is substantial evidence to support the trial court's finding that vitrified sewer pipe and other finished products were taxpayer's first commercially marketable products. We do not agree that the issues are so limited. An overriding consideration is whether the trial court applied the correct legal criteria in making such a determination. The record clearly bears out the Government's assertion that there existed in Indiana, during 1951, a substantial market for fire clay and shale. At the same time, it is also apparent from the record that taxpayer could not have sold its fire clay and shale in that market *at a profit* because of prohibitively high mining and transportation costs. The question squarely presented is thus whether the statutory language which defines, as a part of "mining", "all ordinary treatment processes normally applied by mine owners" to produce "the commercially marketable mineral product or products", includes all processes necessary by a taxpayer to obtain a product *which can be sold by it at a profit*. The Government urges that "mining" includes only the processes necessary for a taxpayer to produce a product which, with the least processing, is "marketable", *i. e.,* for which there is a market; and that it is not material *whether or not it is economically feasible* for a taxpayer to sell in that market. This theory presupposes that there would be a marketable or "depletable" product for each raw or crude mineral, and that the depletion allowance would be computed on this marketable or depletable product.[3]

The Government has attempted, in a *number of cases and with conspicuous* lack of success, to limit the scope of the definition of mining contained in Section 114(b) (4) (B) here before us.

---

3. Section 29.23(m)–1(f) of Treasury Regulations 111 provides a method for the computation of the gross income as follows:

"If the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine, 'gross income from the property' means the amount for which such product was sold, but, if the product is transported or processed (other than by the ordinary treatment processes described below) before sale, 'gross income from the property' means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied, before transportation of such product (other than transportation treated, for the taxable year, as mining). If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes. * * * "

Courts of Appeals in four different federal judicial circuits have uniformly and unhesitatingly rejected such endeavors to narrow the application of the provision's language. In United States v. Cherokee Brick & Tile Company, 5 Cir., 1955, 218 F.2d 424, the Government urged unsuccessfully that since burnt brick and tile were *manufactured* rather than *mineral* products, the processes by which raw brick and tile clay were transformed into burnt brick and tile could be no part of mining for depletion purposes. The Court of Appeals for the Fifth Circuit held that the processes used to produce the burnt brick and tile were the ordinary treatment processes needed to produce the first commercially marketable products. That court has since reaffirmed its holding in the Cherokee case in United States v. Merry Brothers Brick & Tile Company, 5 Cir., 1957, 242 F.2d 708 and, indeed, therein expressly rejected the Government's request that, upon reconsideration and re-examination, it should reverse its previous ruling. The Court of Appeals for the Tenth Circuit, citing the Cherokee case, similarly held against the Government in a case also involving brick and tile clay. United States v. Sapulpa Brick & Tile Corporation, 10 Cir., 1956, 239 F.2d 694. In Dragon Cement Company v. United States, 1 Cir., 1957, 244 F.2d 513, the Government contended that cement was a manufactured product which was chemically different in composition from the depletable product, cement rock, and that, therefore, the taxpayer could not use the gross income from sale of cement as its basis for computing percentage depletion. This was rejected by the Court of Appeals for the First Circuit. Finally, in Townsend v. The Hitchcock Corporation,

4 Cir., 1956, 232 F.2d 444, it was held that the grinding and bagging of talc and the cutting of talc into crayons were ordinary treatment processes by which mine owners obtained the commercially marketable products, even though the final products were manufactured.

In all the above cases, the Government's basic contention was that manufacturing processes could not be "ordinary treatment processes" within the meaning of the Code. Likewise, in each of these cases, the Government readily admitted that each taxpayer had no market, or a market for only a negligible quantity, of the particular raw mineral involved; but urged that this fact was of no consequence since the overriding consideration was that depletion could not be allowed on the sale of manufactured products.

That argument has definitely been laid to rest; the Government has not renewed it before this court. The courts in the above cases uniformly held that the prime consideration was whether taxpayer applied the normal processes necessary to produce the first commercially marketable product, even though what are usually considered manufacturing processes were applied; and the question was treated as one of fact.[4]

The Government contends that the trial court misinterpreted the above cases as holding that a taxpayer could take depletion on its finished product regardless of whether it was the first commercially marketable product. As it points out, in this case it did not admit the nonmarketability of fire clay and shale. Indeed, the Government's evidence indicates that large quantities of fire clay and shale were sold during the

---

**4.** The Court of Appeals for the Fifth Circuit stated in United States v. Cherokee Brick & Tile Company, supra, 218 F.2d at page 425, that:

" * * * [T]he crucial point in this case is one of fact, not of law; and the pleadings admit that fact to be against the Government.

* * * * *

"The complaint alleges that, of the brick and tile clay mined in the United

States, there is opportunity for the sale of only a negligible quantity before it is put into the form of burnt brick and tile. This allegation is admitted in the answer of the appellant. For this and other reasons (but mainly for this one) stated in the opinion of the district court, * * * the judgment appealed from should be affirmed."

tax year, 1951. Thus, in Indiana, of 82 companies engaged in the production or consumption of fire clay and shale, 32 purchased fire clay or shale, or both, for use in their manufacturing operations. Seven producers of fire clay and two producers of shale in Indiana engaged in nonintegrated operations, that is, strictly in the extraction of the raw fire clay and shale and not in further processing. These companies necessarily took depletion on the raw fire clay and shale which they sold. Taxpayer's own expert witness, Haydn H. Murray, admitted, on cross-examination, that over 300,000 short tons of fire clay (of some 500,000 short tons produced) were sold in Indiana in 1951 rather than used by the producer in integrated manufacturing operations.

The taxpayer points out that a good percentage of the clay and shale, actually sold, was sold in the Brazil, Indiana area at prices ranging from $1.60 to $1.90 per ton delivered in the Brazil area. Taxpayer's mining costs alone, ignoring for the moment the transportation costs which would be an added expense if it sought to sell its raw clay and shale, amounted to $2.41 per ton. Those companies selling fire clay in Indiana concerning which the Government introduced evidence fall into two categories. There are those operators who engage primarily in strip mining of coal and, who, during their operations, strip bare so-called underclay which they sell as a byproduct. Secondly, there are those which mine underclay which has already been laid bare by previous strip mining operations. The mining costs of such operators would be considerably below those of taxpayer which operated an underground mine. Further, several of the operators of those mines discussed above could not find a market for all the clay which they had available for sale.

■ We agree with the taxpayer that it did not have a *commercially* marketable product in its fire clay and shale. We are unable to accept the theory that a taxpayer's depletion allowance is to be computed on the basis of a representative market or field price for a product which taxpayer could not sell at a profit. To do so would be to deprive of all meaning the words "commercially marketable" as used in the Code provision here considered.[5] The integrated operations of taxpayer in this case (that is, combined mining and manufacture) were certainly not unique. The evidence the Government used to establish the existence of a market for taxpayer's fire clay indicates, in fact, that the integrated miner-manufacturer was the rule rather than the exception in Indiana, in 1951.

5. In Arvonia-Buckingham Slate Company v. United States, D.C.E.D.Va., 1958, 167 F.Supp. 903, the district court was faced with and rejected the contention that taxpayer involved had a marketable product in unprocessed slate even though the record showed that it was economically unfeasible for taxpayer to mine slate suitable for sale at a profit until it processed the slate into roofing slate shingles. The nature of the seam which taxpayer worked made it necessary for it to blast the slate free and the waste slate, consisting of pieces unsuitable for shingles, sold for only ten cents a ton. In Riverton Lime & Stone Co. v. Commissioner of Internal Revenue, 1957, 28 T.C. 446, 448, the Tax Court held that hydrated limestone was taxpayer's first commercially marketable product for "[w]hile it may have been possible to use petitioner's limestone in its quarried state for agricultural purposes, petitioner could not, and did not, sell it in this market because of the abundance of other limestone in the area which was chemically more suited to the farmers' needs." The Government points out in its brief that appeals are now pending from similar adverse holdings in the following cases: Iowa Limestone Co. v. Commissioner, 1957, 28 T.C. 881, now pending on appeal to the Eighth Circuit and involving the question of whether crushed rather than pulverized limestone is a taxpayer's first commercially marketable product; Sparta Ceramic Company v. United States, D.C.N.D.Ohio, 1958, 168 F.Supp. 401, on appeal to the Sixth Circuit and involving fire clay; and Pacific Clay Products v. United States, (S.D.Calif.), decided October 30, 1958, on appeal to the Ninth Circuit and involving both fire clay and brick and tile clay.

The fact that certain operators of strip mines found it economically feasible to extract and sell fire clay primarily in a limited area near Brazil, Indiana does not alter this picture. Finally, there is no contention that taxpayer applied other than ordinary treatment processes in obtaining its finished products.

In line with its theory that there must be one depletable or commercially marketable product for each mineral, the Government urges that if raw fire clay and shale are not those products for this taxpayer, this case should nevertheless be remanded for further evidence to determine if some other products could have been, with much less processing, the depletable products for this taxpayer. It is suggested that such products could be common brick and ground fire clay.[6] The short answer to this is that we do not agree that it was intended that the depletion allowance for each mineral be reduced to the common denominator represented by a conceivable product most cheaply produced from each mineral. In United States v. Cherokee Brick & Tile Company, supra, and United States v. Sapulpa Brick & Tile Corporation, supra, the Fifth and Tenth Circuits, respectively, allowed depletion on both *brick* and *tile*. In Townsend v. The Hitchcock Corporation, supra, both *talc powder* and *talc crayons* were treated as depletable products.

This is not to say, of course, that a product may be processed beyond the stage at which it is a commercially marketable product. In Sparta Ceramic Co. v. United States, D.C.N.D.Ohio, 1958, 168 F.Supp. 401, the district court recognized this limitation when it refused to allow depletion on the basis of gross income from sales of glazed tile rather than on the representative market price of the unglazed product. Although glazing was accomplished at the time the tile was burnt, about 65% of taxpayer's end product was unglazed and was, in fact, commercially marketable. As the court pointed out, glazing could no more be a necessary treatment process than gold plating, should taxpayer seek to enhance the value of the product by such means. As we have indicated, there is no contention here that the instant taxpayer applied other than normal treatment processes in obtaining its finished products.

The Government relies on Riverton Lime & Stone Co. v. Commissioner of Internal Revenue, 1957, 28 T.C. 446, as authority for the proposition that a small market can establish a representative market or field price for a product. However, in that case it was held merely that, although there were only a few sales of hydrated hydraulic lime in the pure state, the taxpayer could compute its gross income on the market price of that product. Most of taxpayer's sales were of an admixed product rather than a pure product and the Commissioner contended that gross income should be computed on the admixed product by the proportionate profits method [7] since the limited market for pure lime established no representative market or field price for pure lime. That case has no bearing on the problem before us since taxpayer here could not and did not sell its raw fire clay or shale prior to processing.

We find nothing in the opinion in Alabama By-Products Corporation v. Patterson, 5 Cir., 1958, 258 F.2d 892, recently handed down by the Court of Appeals for the Fifth Circuit to indicate that that court has modified its earlier holdings in the Cherokee and Merry Brothers cases. The court merely recognizes in footnote 12 on pages 899–900 of that opinion that neither of those cases involved a question of the existence of a representative market price since in both cases the Government had admitted nonmarketability of the crude brick and tile clay.[8]

---

6. There was evidence that taxpayer did sell some 80 tons of ground fire clay at a little more than twenty dollars per ton.

7. See Section 29.23(m)–1(f) of Treasury Regulations 111, supra note 3.

8. As the taxpayer points out in its brief, at the time the Government appealed from the district court's holding in the Merry Brothers case to the Court of Appeals for the Fifth Circuit, the Govern-

The decision of this court in Zono-lite Co. v. United States, 7 Cir., 1954, 211 F.2d 508, relied upon by the Government is not controlling here. In that case we held only that income received by taxpayer for transporting its mineral product from the mine to place of sale was not includible in the gross income from "mining." In other words we held that such transportation was beyond ordinary treatment processes since taxpayer's product was a commercially marketable product before such transportation costs were incurred. The holding in the instant case is entirely consistent with that decision.

The judgment of the district court is Affirmed.

ment stipulated that five other clay and shale cases should be affirmed if the court adhered to its ruling in the Cherokee case. Three of those cases involved fire clay.