**BARTON MINES CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT**

Docket Nos. 3186–67, 3908–67. Filed November 13, 1969.

*Robert S. Ryan,* for the petitioner.
*Max J. Hamburger,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioner's income tax as follows:

| Docket No. | TYE June 30— | Deficiency |
|---|---|---|
| 3186–67 | 1962 | $11, 167. 64 |
| | 1963 | 11, 386. 19 |
| | 1964 | 33, 639. 53 |
| 3908–67 | 1965 | 19, 067. 74 |
| | 1966 | 49, 603. 17 |

All but one of the issues raised by the pleadings have been disposed of by stipulation. The remaining question requires our determining which of the treatment processes applied by petitioner to the mineral garnet are to be considered as "mining," within the meaning of section 613(c)(4)(D),[1] for the purpose of computing the percentage

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

depletion allowance to which petitioner is entitled for the taxable years ending June 30, 1962, through June 30, 1966.

Barton Mines Corp. (hereinafter referred to as petitioner) was organized under the laws of the State of New York on December 15, 1924. Its principal place of business is located at Gore Mountain, North Creek, N.Y. Petitioner filed its Federal corporation income tax returns for the taxable years ending June 30, 1962, through June 30, 1966, on an inventory and accrual basis of accounting, with the district director of internal revenue at Albany, N.Y.

During the years in issue petitioner was the lessee of a garnet mine and a producer of garnet grains and powders. Petitioner is the only producer of garnet powder, which is used for grinding lenses, grinding or lapping semiconductor materials, manufacturing plate glass, and sandblasting. Petitioner's garnet grain is the only garnet used in the manufacture of coated abrasives (commonly known as sandpaper). During the years in issue approximately 60 percent of petitioner's sales were of garnet powders; the remaining 40 percent represented sales of garnet grains.

Petitioner's garnet is sold in competition with products—all of which are harder than garnet—such as corundum (natural aluminum oxide), synthetic aluminum oxide, synthetic silicon carbide, and diamonds (both natural and manufactured). All of these products, with the exception of some manufactured diamonds, are mined or synthesized outside of the United States and then imported into this country, where they are crushed, ground, and sized by domestic manufacturers.

Prior to 1933 petitioner sold garnet concentrates (i.e., unsorted material containing about 91 percent garnet) exclusively. In that year petitioner obtained grading and heat-treatment equipment and began selling finished garnet grains; it entered the garnet powder market in 1944, after the War Department approved a necessity certificate to build a facility for the "Manufacture of Abrasive Garnet Flours." However, petitioner continued to sell garnet concentrates through 1958; and even during the years in issue petitioner's pricelists advertised that its grains and powders were available as "Untreated" (i.e., not processed through the capillarity unit, described below), and petitioner actually sold garnet grains to one customer, which heattreated the grains in its own capillarity units. Petitioner has since discontinued the sale of such grains.

"Garnet" is a generic term for several mineralogically different substances having the same general chemical formula. The ore mined by petitioner—composed of almandite, an iron-aluminum silicate, and pyrope, a magnesium-aluminum silicate—contains about 8 to 10 percent garnet by volume. The garnet occurs in the form of round reddish crystals (or pockets) several inches in diameter, encased in, and encasing, other rock materials. The most significant of these are hornblende, feldspar, and small amounts of magnetite (the magnetic oxide of iron) and biotite mica. The following table shows the specific gravity and hardness of these minerals:

| Mineral | Specific gravity [1] | Hardness [2] |
|---|---|---|
| Garnet | 3. 9–4. 1 | 8–9 |
| Hornblende | 3–3. 2 | 5 |
| Feldspar | 2. 6 | 6 |
| Biotite mica | 2. 9–3. 1 | 2. 5–3 |
| Magnetite | 5–5. 1 | 5 |

[1] Number of times as heavy as water.
[2] Judged on a Mohs scale, on which 10 is the hardest mineral (diamond) and 0 is the softest.

It is stipulated that petitioner's garnet is entitled to a 15-percent depletion rate pursuant to section 613(b)(7) and that it is "not customarily sold in the form of the crude mineral product," as that phrase is used in section 613(c)(4)(D).

Petitioner's garnet, as mined, is characterized by lamination planes which cause it to fracture in a manner which creates sharp cutting edges. This lamination, in combination with extreme hardness, is what makes garnet desirable as an abrasive.

Petitioner's processes are designed to free the garnet from the other rock material in as pure a form as is technologically and commercially feasible. High purity is essential because magnetite and other magnetic materials are injurious in abrasive uses; and hornblende, feldspar, and mica are softer than garnet, thus diminishing its abrasive qualities if present in significant amounts. The garnet sold by petitioner during the years in issue was 98-percent pure. In the past petitioner had sold material with a lesser garnet content: In the late 1920's, petitioner sold garnet with a purity of 90–92 percent; in 1940, 94 percent; in 1944, 95 percent. However, the processes used at these times were less efficient than modern methods, and thus higher purity was economically unfeasible.

In order to be able to compete successfully in the abrasives industry, petitioner's garnet grains also must be clean, so that they can adhere to the backing in the production of coated abrasives, and they must be of a uniform color, so that the coated abrasive will not be streaked; garnet has both of these qualities in its natural state, but

it acquires oil, grease, and certain chemicals, and loses its uniform color, during processing.

Finally, competition requires petitioner to produce a full range of powder and grain sizes. During the years in issue petitioner maintained an inventory of garnet powders in the micron sizes (17 different grades ranging from 2 to 35 microns and 8 "untreated" grades ranging from 12 to 29 microns) and larger sizes (8 different grades ranging from 240 mesh[2] to ·600 mesh), and also advertised that "Grades finer than [the normal range of micron sizes] are also available." Petitioner also maintained an inventory of as many as 25 different grades of garnet grains during the years in issue, ranging in size from 4 mesh to 240 mesh, and made other grades "available according to customer specifications."

*Petitioner's Processes.*—The following chart lists the processes utilized by petitioner during the years in issue in the production of garnet powders and grains:

*From mine*

1. Jaw crusher
2. Screen No. 1
    Magnetic separator No. 1
    Gyratory crusher (then back to screen No. 1)
3. Screen No. 2

| *Heavy media process* | *Flotation process* |
|---|---|
| 1. Heavy media tank No. 1 | 1. Ball mill No. 1 |
| 2. Heavy media tank No. 2 | 2. Screen No. 4 |
|     Rod mill (then back to tank No. 1) | 3. Flotation tank |
| 3. Roll crusher | 4. Screw dewaterer No. 2 |
| 4. Screen No. 3 | |
| 5. Screw dewaterer No. 1 [1] | Dryer No. 1 ("Dryer H") |
| 6. Cone dewaterer No. 1 | Magnetic separator No. 2 |

| *Powder mill* | *Grain mill* |
|---|---|
| 1. Magnetic separator No. 3 | 1. Screens No. 5 |
| 2. Ball mill No. 2 |     Air tables Nos. 1 & 2 |
| 3. Cone dewaterer No. 2 | 2. Screens No. 6 |
| 4. Magnetic separator No. 4 | 3. Screens No. 7 |
| 5. Thickener | 4. Magnetic separator No. 6 |
| 6. Magnetic separator No. 5 | 5. Capillarity unit |
| 7. Classifying separator | 6. Screens No. 8 |
| | 7. Packaging |

| *Flow A* | *Flow B* |
|---|---|
| Pans | Cone No. 3 |
| Dryer No. 2 | Filter |
| 8. Screen No. 9 | Dryer No. 3 |
| 9. Packaging | |

[1] The majority of the material emerging from this dewaterer is processed through dryer H; the major feed for the powder mill is the rejects from screens Nos. 6 and 7.

N.B. The concentrate mill consists of the heavy media and flotation processes.

[2] The mesh size indicates the number of openings in the screen, and hence the number of particles, per linear inch.

*Primary Crushing and Screening.*—Petitioner's processes begin with open-pit mining of the garnet ore, which is then transported to petitioner's mill and placed in a jaw crusher. As a result of this primary crushing, most of the rock material is reduced in size so that it will pass through a 1-inch to 1¼-inch screen (No. 1). The material that does not pass through is given a second crushing (or more if required) by a gyratory crusher, until it is small enough to pass through the screen. A magnetic separator (No. 1),[3] set over the mass moving toward the gyratory crusher, withdraws magnetite and any iron, called "tramp iron," that may have intruded into the mixture.

The material that has passed through screen No. 1 drops onto screen No. 2, which screens out pieces in excess of approximately ⅛ to ¼ inch. At this point a separation takes place in the feedline: The material that is too large to pass through screen No. 2 is processed through heavy media tanks; the "fines" that pass through screen No. 2 are sent through a flotation process.

*Heavy Media Process.*—Petitioner began using the heavy media process in 1941. In this process separation of the garnet from the other rock material is based on the theory that if the entire mass is suspended in a tank containing a fluid medium with a certain specific gravity, the garnet, being heavier than the fluid, will sink to the bottom of the tank and the other material, being lighter than the fluid, will float off the top.

Petitioner uses two heavy media tanks. In the first tank the non-garnet impurities are floated off and discarded, while the garnet-rich particles drop into the second tank, which contains a heavier fluid medium. The material that floats off the top of this tank is processed through a rod-milling crusher to separate the garnet and impurities, and the garnet is then recirculated across screen No. 2.

The material emerging from tank No. 2 usually is processed through a roll crusher, although upon occasion it goes directly to the powder mill. The roll crusher, which is set in a tank of water, reduces the size of the feed so that it will pass through screen No. 3. The material passing over screen No. 3 is recirculated through the roll crusher for further size reduction.

Most of the particles pass through screen No. 3 into screw dewaterer No. 1, where they are washed with water at high velocity. Fine powdery garnet, a small portion of the material in the screw dewaterer, is floated off the top and collects in cone dewaterer No. 1, while the bulk of the material moves toward dryer H. The powdery

[3] Numerous magnetic separators are placed at various points in petitioner's processing. These separators cannot withdraw all the magnetic impurities in the processed material, because to do so would entail also withdrawing a good deal of garnet. The material withdrawn by these separators is normally recirculated through prior processes.

garnet collecting in the cone dewaterer proceeds to the powder mill, bypassing dryer H; the water that overflows the cone dewaterer contains impurities which are discarded. Respondent concedes that the processes through screw dewaterer No. 1 and cone dewaterer No. 1 are subject to depletion.

*Flotation Process.*—Returning to the point of separation at screen No. 2, the "fines" which pass through this screen are subjected to a flotation process—a method of gravity concentration which petitioner has used since 1946—because they are too small to be separated by the heavy media process. The first step in the flotation process is a ball milling chamber (No. 1), where the fines are further reduced in size so that they will pass through screen No. 4; the material that does not pass through is recirculated through the ball mill.

The material then passes into a flotation tank, where a flotation reagent (a petroleum sulfonate made by American Cyanamid, known as "Aero-float 825") and foaming agents in an acid solution are added to the water and sand in the tank. The reagent and foaming agents adhere selectively to the garnet particles and cause them to be coated with air bubbles, with the result that the garnet will float on the surface of the liquid while the impurities sink and are discarded. A byproduct of the processing in the flotation tank is ferrous sulphate, which is produced by a chemical reaction of the flotation solution with the iron particles in the processed material.

The garnet floats off the top of the flotation chamber and moves to screw dewaterer No. 2, which operates essentially the same as screw dewaterer No. 1. The material that floats off the top of screw dewaterer No. 2, being high in non-garnet content but also rich in garnet, is recirculated through the flotation tank to recover the garnet. The material that passes through screw dewaterer No. 2 merges with the larger concentrates approaching from screw dewaterer No. 1 to form a single combined feed just prior to entering dryer H. At this point the feed contains approximately 91 percent garnet by volume. Respondent concedes that the processes through screw dewaterer No. 2 are subject to depletion.

*Dryer H.*—Ferrous sulphate is sprayed on the feed entering dryer H. This dryer is a long cylinder set on an inclined plane so that the concentrates within it are moved toward the lower end as it revolves. Large quantities of hot air are introduced into its center, producing an air temperature of 1300° F. The garnet concentrates remain in the dryer for 30 to 35 minutes, reaching an average temperature of 700° F. and attaining a maximum temperature of about 1000° F. at the point of emergence from the dryer. A very small quantity of fine garnet, mixed with fine impurities, reacts to the moving air in the dryer and

is sent to the powder mill. The material emerging from the dryer still has a garnet content of about 91 percent.

As a result of the treatment in dryer H, the sharp edges of some of the garnet particles are rounded very slightly and the garnet no longer has complete color uniformity, emerging in varying shades of reddish brown. This color transformation, however, is superficial, due in some degree to the partial formation of a thin layer or "skin" (see description of the capillarity unit, below). The heat also dries the feed material and burns off the chemicals and contaminants accumulated during the prior processes. The feed is dried by petitioner partly for the reason that the processes in the grain mill function more efficiently with dry garnet than with wet garnet.

Less than 1 percent of the material emerging from dryer H goes directly to petitioner's powder mill. The rest flows past magnetic separator No. 2 and enters upon the sizing and grading processes of the grain mill.

*Grain Mill.*—The first five screens (No. 5) in the grain mill grade the unsorted garnet concentrates into five narrow ranges called "group grades," which are thereafter processed separately into specific grain sizes.[4] Prior to 1964 all five group grades flowed directly to screens Nos. 6 and 7. But in 1964 petitioner installed two air tables, which separate the garnet and non-garnet material through the use of air currents and vibration of the tables. The two smallest group grades bypass the air tables because they are too small to be separated there effectively. The three largest grades are processed through the tables one grade at a time. The garnet content of the material is increased from 91 percent to 93 percent by the air-tabling process.

Screens Nos. 6 and 7 effect the final removal of impurities by the use of gravity—lighter non-garnet particles of a given size have less tendency to pass through the screens than similar size, but heavier, garnet particles. To efficiently implement this separation the particles being processed through the screens must be graded to very close sizes. Screens No. 6 consist of several different sized screens which separate each group grade into two feeds for two finished grades; the in-between sizes are rejected. Screens No. 7 grade the garnet grains to reasonably precise sizes. About 50 percent of the material passes through screens Nos. 6 and 7; the remaining 50 percent becomes the major feed for the powder mill.

After the garnet grains have been processed through screens No. 7, they are again subjected to a magnetic separation (No. 6). Some of the grains proceed directly to the final screens (No. 8) ; these are known

---

[4] For example, the first of these five screens yields group grade 2036, from which the grain sizes 16, 20, 24, 30, and 36 mesh are ultimately produced.

as untreated (UT) finished grade. The large majority of the grains, however, are processed through the capillarity unit, a revolving cylinder to the external shell of which heat is supplied. The grains enter the cylinder at room temperature (approximately 70° F.) and remain there for 10 minutes, momentarily reaching a maximum temperature of 1660° F.

The garnet grains emerging from the capillarity unit generally have a red color similar to that of the natural garnet. The color depends upon the temperature to which the grains are subjected and the time they remain in the unit—the higher the temperature or the longer the grains are in the unit, the deeper red they become—as well as the size of the grains. As each group of sized grains emerges from the capillarity unit it is compared with a color standard in order to achieve a 100-percent color uniformity within the individual size. Uniformity-of-color standards are required to satisfy customer demands.

The heat treatment in the capillarity unit has the following additional effects on the garnet: (1) It heals incipient fractures—caused by the crushing operations—on the surface of the garnet grains; (2) the heat acting on the ferrous sulphate produces a tough, thin (less than 2 microns thick), superficial layer called a "skin"; (3) the sharp edges of some of the garnet particles are rounded to a greater extent than the rounding effected by the heating in dryer H; and (4) certain of the atoms within each unit cell or crystal of the garnet are slightly rearranged, although the atomic proportions of the various chemical elements therein remain constant. Any improvement in the abrasiveness of petitioner's garnet which might result from heat treating in the capillarity unit would be due to the healing of cracks or formation of the skin. However, the heat treatment does not produce any structural transformation in the garnet, cause the formation of a precipitate phase in the garnet, induce a major (more than 5 percent) change in the garnet's specific gravity, or induce readily measurable changes in the refractive index of the garnet.[5]

During the years in issue the amount of heat supplied to the capillarity unit depended upon whether the grains were to receive medium-heat treatment (MT), which requires a temperature of 1700° F., or high-heat treatment (HT), which requires a temperature of 1800° F.; petitioner sold both kinds of treated grains, as well as untreated (UT) grains. The designations HT and MT were abandoned by petitioner after the tax years and replaced by the single designation RT (capillarity treated). The reason for this change was twofold: (1) A report

---

[5] The acicular (needlelike) inclusions found in the capillarity-treated garnet are not products of the heating, but are inherent natural characteristics of garnet.

prepared for petitioner (referred to as the Battelle report) found, contrary to a general belief which had been shared by members of the abrasives industry, that the garnet's abrasive quality was not affected by *variations* in the amount of heat to which the garnet had been subjected; and (2) it was costly to maintain separate inventories of UT, MT, and HT grains. Presently, with the cessation of sales of untreated grains since the tax years, petitioner need maintain but one inventory for its sized garnet grains.

After the grains leave the capillarity unit they are processed through "scalper" screens (No. 8), as are the grains that bypass the unit. These screens, 17 or 18 in number, perform the functions of finally removing any oversized or coarse material and of separating the grains into the ultimate sizes. Most of the grains pass through the scalper screens and are packaged and sold; those which do not pass through become feed for the powder mill.

The garnet grains thus processed through the scalper screens have been graded to very close tolerances called narrow bands. This means that a container of garnet grains of a certain size will contain very few particles that are not that size. These size specifications are set by the National Bureau of Standards in cooperation with the industry. Petitioner purifies and grades its garnet grains to meet the requirements of the coated abrasives industry, i.e., "to supply the market"; in addition to meeting the standard specifications, petitioner also fills orders for garnet grain products according to individual customer specifications.

*Powder Mill.*—The major constituent of the feed for the powder mill is the untreated material rejected at screens Nos. 6 and 7 in the grain mill. In addition, the feed consists of: (1) The small amount of "fines" which come out of dryer H; (2) the material caught up by the magnetic separators, if it contained garnet; (3) surplus sizes of group-graded grains from screens No. 5; (4) the garnet which does not emerge from the capillarity unit at a uniform color, and the finished grains rejected at screens No. 8; [6] (5) the minor amount of material settling in cone dewaterer No. 1; and (6) the almost negligible amount diverted from heavy media tank No. 2. The feed for the powder mill has an average garnet content of about 85 percent.

The processing begins when the feed passes through magnetic separator No. 3, and into ball mill No. 2, a rotating cylinder filled with steel balls, in which petitioner can control the sizes to which the feed is crushed. The crushing also liberates non-garnet impurities from the garnet, restores uniformity of color to the garnet, and scrubs the garnet.

From the ball mill the powder passes into cone dewaterer No. 2, which also is used for size separation. The larger particles settle to the

---

[6] These are the only sources of powder mill feed which have been capillarity treated.

bottom of the cone and are recirculated to ball mill No. 2; the smaller particles flow off the top of the cone, past magnetic separator No. 4, and into a thickener. The latter is a large tank filled with moving water, the velocity of which is controlled so that the impurities tend to float—and are then discarded—while the heavier garnet-rich particles tend to sink.

The particles that settle in the thickener are pumped past magnetic separator No. 5 to the classifying separator, which is a long tube-like device containing approximately 15 successively larger bins set one next to the other. The feed enters the smallest bin first, where a regulated flow of water causes the largest, heaviest particles to settle out at the bottom. The water from the first bin overflows into the next larger bin, where the velocity of the water is reduced somewhat from that in the first bin, with the result that the next smaller powder size settles to the bottom. This procedure is continued through all 15 bins, each containing a successively smaller powder size. At the final bin the impurities flow off the top and are discarded.

The closely sized powder settling at the bottom of each bin is then dried by one of two processes, noted in the chart above as "Flow A" and "Flow B." Flow A involves the use of metal pans, each about 3-feet square and 2 to 3 inches deep, one pan under each bin. The powder at the bottom of each bin drops into a pan, which is then placed in dryer No. 2 and dried at 300° F. The two largest sizes emerging from dryer No. 2 are taken over to screens No. 6 for final processing into grains. The bulk of the dried material, however, is packaged as powders after screening off further impurities at screen No. 9.

Flow B utilizes continuous flow drying—performed by a filter and a continuous dryer (No. 3), also set at 300° F.—the separation process having been achieved through a cone separator (No. 3), which performs the same basic function as the pans in Flow A. In this process only one powder size can be put through the dryer at a time. After passing the continuous dryer this powdered material also is processed through the final screen and then packaged.

Petitioner produces garnet powders in various sizes. The smallest size powder described on petitioner's price lists for the years in issue was 2 microns, which is much smaller than pulverized limestone commonly used in flowerbeds and is described in petitioner's literature as "several times finer than ladies' face powder." This size powder cannot be seen by the naked eye; approximately 200 million particles this size would be needed to cover a 1-square-inch surface with a layer one particle thick. Moreover, petitioner's pricelists advertise that "Grades finer than listed * * * are also available." Production of the whole range of micron-size powders (2—35 microns) constitutes fine pulverization.

On its corporation income tax returns filed for each of the taxable years here involved, petitioner treated the gross receipts from all of the described processes as "Gross Income From [mining] Property," upon which it computed its depletion allowance. In the notices of deficiency respondent determined "that some of the processes applied by [petitioner] in the treatment of Garnet are not treatment processes considered as mining within the meaning of Sections 613(c)(4) and (5) of the Internal Revenue Code of 1954," and asserted deficiencies accordingly.

### OPINION

The present controversy calls upon us to determine which of the treatment processes applied to petitioner's garnet ore are to be considered as mining for the purpose of computing petitioner's percentage depletion allowance for its taxable years ending June 30, 1962, through June 30, 1966. A brief summary of the statutory framework will set the background of the issue.

Section 611(a) provides generally that in the case of mines there shall be allowed as a deduction in computing taxable income a "reasonable allowance for depletion." [7] Under section 613(a) this allowance is prescribed as a specified percentage (15 percent for garnet, sec. 613(b)(6)) of "the gross income from the property," not to exceed 50 percent of the taxable income from the property, computed without the allowance. "Gross income from the property" is defined in section 613(c)(1) as "the gross income from mining"; "mining," in turn, is defined in section 613(c)(2), as amended by section 302(b) of the Public Debt and Tax Rate Extension Act of 1960, Pub. L. 86–564, 74 Stat. 290 (hereinafter the Gore amendment),[8] to include the extraction of ores or minerals from the ground plus "the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto)." [9]

The parties agree that "the treatment processes considered as mining" applicable to garnet are those set forth in section 613(c)(4)(D). That

---

[7] Sec. 611(a) also confers specific authority to prescribe regulations under the depletion provisions. The regulations pertinent to this case were promulgated after the conclusion of the trial herein. T.D. 6965, 1968–2 C.B. 265, approved July 25, 1968. Respondent stated on brief that no objection would be raised if petitioner moved for a reopening of the record to present additional evidence in light of the regulations. However, petitioner made no such motion.

[8] This is the first case requiring an application of the definition of mining enacted by the Gore amendment, effective for taxable years beginning after Dec. 31, 1960. One taxable year beginning after that date was involved in *Featherlite Co. of San Antonio* v. *United States,* 406 F. 2d 564 (C.A. 5, 1969), a per curiam affirmance of a District Court judgment on which no opinion was written, but neither court and neither party's brief discussed the significance of the Gore amendment.

[9] The Gore amendment substituted the quoted language for the following: "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * * [frequently referred to as the 'commercially marketable' test]."

subparagraph relates to "ores or minerals which are not customarily sold in the form of the crude mineral product" and lists the following processes:

crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore or the mineral or minerals from other material from the mine or other natural deposit;

Finally, section 613(c)(5), also enacted by the Gore amendment, excludes from mining certain enumerated processes as follows:

(5) TREATMENT PROCESSES NOT CONSIDERED AS MINING.—Unless such processes are otherwise provided for in paragraph (4) (or are necessary or incidental to processes so provided for), the following treatment processes shall not be considered as "mining": electrolytic deposition, roasting, calcining, thermal or electric smelting, refining, polishing, fine pulverization, blending with other materials, treatment effecting a chemical change, thermal action, and molding or shaping.

In deciding which of petitioner's treatment processes are to be considered as mining under these provisions we must bear in mind that the Gore amendment does not alter the basic principles of the prior law on depletion. This is clearly demonstrated by the legislative history of that enactment.

Prior to January 1959 a series of court decisions, beginning with *United States* v. *Cherokee Brick & Tile Co.*, 218 F. 2d 424 (C.A. 5, 1955), had so applied the "commercially marketable" test as to allow percentage depletion on the gross income derived from the finished products of integrated miner-manufacturers. See Fernald, "Gross Income from Mining: A Critique of Cannelton," 23d Ann. N.Y.U. Tax Inst. 1379, 1381 (1965). On January 26, 1959, the Secretary of the Treasury recommended to Congress the elimination of the vague language of the "commercially marketable" test as a solution to this problem. Hearings before the House Committee on Ways and Means on the Legislative Proposal of the Treasury Department Specifying the Treatment Processes which Shall Be Considered Mining for the Purpose of Computing Percentage Depletion in the Case of Mineral Products, 86th Cong., 1st Sess., p. 1a (1959) (hereinafter the 1959 hearings). The assistant to the Secretary explained that the recommendation represented "merely the enactment of the total scheme as it existed under the regulations and the statute from the 1920's to at least 1955, the year of the Cherokee case decision." *Id.* at 49.

In view of the grant of certiorari (361 U.S. 923 (1960)) in *Cannelton Sewer Pipe Co.* v. *United States*, 268 F. 2d 334 (C.A. 7, 1959), both the House Ways and Means Committee (106 Cong. Rec. 14546

(1960)) and the Senate Finance Committee (*id.* at 13218) deferred action on the Treasury's proposal. Nevertheless, Senator Gore introduced it on the Senate floor, expressing the hope of "closing * * * some loopholes" and combating the trend toward vertical integration, hence "toward monopoly," which had resulted from allowing depletion on finished products. *Id.* at 13217 and 13221 (remarks of Senator Gore), 13223 (Senator Proxmire). This was to be accomplished, according to Senator Byrd, Chairman of the Senate Finance Committee, by permitting depletion only upon extraction of the mineral from the ground "plus a limited number of treatment processes ordinarily directly associated with mining, through long mining practice." *Id.* at 14514 (explaining the conference report on the Gore amendment, Conf. Rept. No. 2005, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 741).[10]

Since the Gore amendment did not change the fundamental principles of prior depletion law, it must be applied in light of the Supreme Court's expression of those principles in the landmark case of *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76 (1960), decided the day the conference report was presented to the Senate (106 Cong. Rec. 14510 (1960)). The major thrust of that decision is that the depletion allowance must not be permitted to give an integrated operator a competitive advantage over nonintegrated miners or manufacturers: "Congress never intended that depletion create such a discriminatory situation." 364 U.S. at 87.

The first contested process in the present case is the treatment in dryer H. Respondent contends that this is a nonmining process in that it involves (1) "blending with other materials," (2) "roasting," (3) "thermal action," and (4) "treatment effecting a chemical change" within the meaning of section 613(c)(5), and treatment effecting a physical change within the meaning of decided cases. Petitioner contends that the dryer H treatment is "necessary or incidental" to "beneficiation by concentration," [11] a process considered as mining under section 613(c)(4)(D). We agree with petitioner.

---

[10] The conference made several changes in the Senate version of the amendment. Chairman Mills of the House Ways and Means Committee explained the reason for the changes as follows (106 Cong. Rec. 14546 (1960)):

"The language accepted by the House conferees accomplishes the objective of the original amendment. The language of the original amendment * * * would have a number of unintended effects in the way of upsetting long-established Treasury practices in the depletion area which * * * were not involved in the court decisions.

"The new language adopted by the conferees follows much more closely the language in the existing statute to avoid these unintended effects."

[11] Sec. 1.613–3(f)(3)(i), Income Tax Regs., defines "concentrating" to mean "the process of eliminating waste, separating the valuable mineral from the valueless, or separating two or more valuable minerals or ores. Examples of sorting and concentrating processes are hand or mechanical sorting, magnetic separation, gravity concentration, jigging, the use of shaking or concentrating tables, the use of spiral concentrators, the use of sluices or sluice boxes, sink-and-float processes, and flotation processes such as bubble, skim, and froth flotation." This definition is made applicable under sec. 613(c)(4)(D) by sec. 1.613–3(f)(4) of the regulations.

Our study convinces us that although section 613(c) lists processes which shall and shall not be considered as mining, a mechanical application of the statutory language was not intended; we do not believe that Congress meant for us to embark upon the task of determining which of opposing parties' technical descriptions of a disputed process more precisely fits a statutory term. Rather, it is necessary to determine the function served by the particular process in question. For example, a process that is "substantially equivalent" to a process enumerated in section 613(c)(4)(D) will be considered as mining only if it is "used in the separation or extraction of the product or products from the ore or the mineral or minerals from other material from the mine or other natural deposit." And the processes listed in section 613(c)(5) are not to be considered as nonmining processes if they are "necessary or incidental" to mining processes.[12] The importance of the function served by a process is also recognized in the regulations. See, e.g., sec. 1.613–3(f)(4) and (g)(2), Income Tax Regs.

While the issue is hotly contested, we believe the record quite clearly shows that dryer H serves three distinct functions made necessary by the heavy media and flotation processes (both of which are conceded by respondent to constitute mining): (1) Drying the garnet material, (2) removing grease, oils, and flotation reagents added or accumulated in the prior processes, and (3) preserving relative color uniformity of the garnet.

Regarding the first of these functions, the material emerging from the heavy media and flotation processes—both of which entail the use of large tanks filled with water and other liquids—is wet, and dryer H removes the water thus accumulated. The removal of water accumulated in prior concentration processes is, under the test outlined by Senator Byrd, see text accompanying footnote 10 *supra*, a process "directly associated with mining, through long mining practice." Richards & Locke, Textbook of Ore Dressing 347–349 (1940); Gaudin, Principles of Mineral Dressing 500–501 (1939).

As to the second function served by dryer H, the feed to the dryer contains oils, grease, and flotation chemicals. The period of time during which the garnet is subjected in the dryer to an air temperature of 1300° F. (the garnet itself reaching an average temperature of 700° F. and a maximum temperature of 1000° F.) is determined, according to the undisputed testimony, by the temperature required to decompose and drive off as close to 100 percent of these accumulated contaminants as possible.

Finally, as to the preservation of color uniformity, garnet when taken from the earth has a uniform reddish color. A small amount

---

[12] Sec. 1.613–3(f)(2)(iii), Income Tax Regs., defines "necessary" in the following terms: "A process is 'necessary' to another related process if it is essential to the performance of the other process."

of ferrous sulphate is incidentally produced in the flotation process by a chemical reaction of the iron particles in the feed with the flotation ingredients (which include an acid). Since no ferrous sulphate is present in the feed from the heavy media process, and since that chemical reacts to the heat of the dryer, causing a color change, a dilute ferrous sulphate solution is added to the feed so that the mixture emerging from dryer H will have relative color uniformity—a brownish cast. Otherwise, the mixture would be streaked.

In a real sense, therefore, dryer H completes the flotation and heavy media processes by removing the water and contaminants accumulated in those processes and eliminating a color problem which would otherwise arise. When viewed in the light of these functions, it is our conclusion that the dryer H treatment is "necessary or incidental" to the flotation and heavy media processes. See Rev. Rul. 67–227, 1967–2 C.B. 223–224, advising that "Drying is allowed* * * as necessary or incidental * * * to treatment processes of washing."

Section 613(c)(5) specifically provides that if a process is "necessary or incidental" to a process "otherwise provided for" in section 613(c)(4), it will not be considered as nonmining. Moreover, the regulations, as well as the legislative history, clearly show that this result obtains even though the necessary or incidental process by itself would be considered as nonmining.[13] The Assistant Secretary of the Treasury who presented the proposed legislation to the House Ways and Means Committee carefully so explained his proposal;[14] and whereas the Senate version of the Gore amendment limited mining processes not specifically listed therein only to those "necessary" to the process of "beneficiation" (H.R. 12381, 86th Cong., 2d Sess., p. 10 (1960)), the conference incorporated the more liberal phrase "necessary or incidental" into the general definition of mining in section 613(c)(2), thus making it applicable to all processes, expressly to assure flexibility. 106 Cong. Rec. 14513 (1960).

The treatment in dryer H, therefore, is subject to depletion, as a necessary or incidental process, notwithstanding that it might otherwise constitute nonmining. However, even were this not true, we still would sustain petitioner, because we do not believe that the dryer H treatment can be considered as nonmining.

---

[13] Sec. 1.613–3(f)(2)(iii), Income Tax Regs., provides in part that—

If a taxpayer demonstrates that a particular process is necessary or incidental solely to a process named as a mining process in section 613(c)(4) or this paragraph, the necessary or incidental process will also be considered a mining process.

[14] For example, he testified as follows (1959 hearings at 7) :

"Although the draft bill specifically provides that certain processes will not be considered mining processes as such, it also provides that any of the disallowed manufacturing processes will be treated as mining, as they have in the past, where such processes are necessary to, or are an integral part of, separating the mineral from waste, termed 'beneficiation by concentration' in the draft bill."

Also see *id.* at 61.

We do not understand the spraying of the dryer H feed with ferrous sulphate to constitute "blending with other materials" [15] within the meaning of section 613(c)(5). The purpose of the spray is not to create a new product, compound, or blend of products, and no homogenization occurs. The ferrous sulphate does not become a constituent element of the dryer discharge.

Nor does the processing in dryer H involve "treatment effecting a chemical change," "roasting," or "thermal action." Respondent's expert defined a "chemical change" as "any rearrangement of the atoms or molecules or electrons in a compound," and respondent urgently insists that any color alteration is evidence of a chemical change.[16] Respondent also takes the broad position that "thermal action" refers to "treatment of something by elevated temperature" and that " 'roasting' is to 'thermal action' as 100 is to 50." [17]

Respondent's arguments may represent good theoretical chemistry, but we do not think they are good law. Section 613 deals with mining economics. It is concerned with drawing the line between mining and nonmining processes, not with molecular or atomic or, indeed, color changes as such. Thus, the Court in *Cannelton*, summarizing that section, observed that "none of the permissible processes destroy the physical or chemical identity of the minerals or permit them to be transformed into a new product." 364 U.S. at 85–86. See *Morton Salt Co. v. United States*, 161 Ct. Cl. 640, 316 F. 2d 931, 935 (1963), certiorari denied 375 U.S. 951 (1963). In accordance with this observation, we believe that the terms "roasting" and "thermal action" refer to more than just "treatment of something by elevated temperature," and require the application of heat to effect a significant or desired change in

[15] That respondent is seeking in this case to extend the application of this phrase not defined in the statute or regulations, beyond its intended meaning is suggested by sec. 1.613–3(g)(6)(vi) of proposed regulations published July 26, 1968 (33 Fed. Reg. 10706 (1968)), which contains the following definition: "The term 'blending with other materials' refers to processes used to blend different kinds and grades of minerals with one another, as, for example, blending iodine with common salt for the purpose of producing iodized table salt."

[16] Here again, the position taken by respondent in the present case is much broader than the proposed regulations (sec. 1.613–3(g)(6)(vii), 33 Fed. Reg. 10706 (1968)):

"The term 'treatment effecting a chemical change' refers to processes (other than designated mining processes) which transform or modify the chemical composition of a crude mineral, as, for example, the coking of coal or the retorting of oil shale. The term also refers to processes (other than incidental use of chemicals in designated mining processes) which utilize chemicals to separate one mineral from another, or to clean or purify minerals, as, for example, the use of chemicals to produce magnesium compounds from brine, or to bleach kaolin."

[17] Mixing his arguments on dryer H with those on the capillarity unit, respondent makes much of certain references in the Vogel article, written by a former officer of petitioner, and the Battelle report to the heat treatment of garnet as "roasting." We note, however, that the Battelle report, prepared prior to the initiation of this tax controversy, uses the term "roasting" only in connection with the medium-treated (MT) and high-treated (HT) garnet, both of which are processed through the capillarity unit. When referring to garnet that is processed only through dryer H but not through the capillarity unit, i.e., untreated (UT) garnet, it uses the term "flash dried."

the ore or mineral. Webster's Third International Dictionary (1961) ; Richards & Locke, Textbook of Ore Dressing 353 (1940) ; Kirk & Othner, 8 Encyclopedia of Chemical Technology 936 (1952) ; A Dictionary of Mining, Mineral, and Related Terms (Bureau of Mines 1968). The processing of the garnet in dryer H to remove water and contaminants and to prevent loss of color uniformity does nothing to destroy the identity of the garnet, transform it into a new product, or effect a significant change in it. The dryer H treatment, therefore, does not fall within the list of disallowed processes.

Over 99 percent of the material emerging from dryer H flows past magnetic separator No. 2, where tramp iron, magnetite, and other magnetic impurities are removed. Section 613(c)(4)(D) expressly provides that concentration by magnetic processes is to be considered as mining.

The material passing magnetic separator No. 2 enters the grain mill and is processed through screens No. 5. The primary function of these screens is to grade and size the garnet grains, in preparation for sale of the finished product. Grading and sizing is not enumerated in section 613(c)(4)(D), nor is it a process "used in the separation or extraction of the * * * mineral * * * from other material from the mine." Only small amounts of impurities are removed by the screens, and the rejects from these screens become the primary source of feed for the powder mill. This screening and sizing of the grains does not constitute a mining process, even though it nominally involves a method of gravity concentration. See sec. 1.613–3(g)(2)(i), Income Tax Regs.[18] None of the processes listed in section 613(c)(4)(D) or in the examples in regulations section 1.613–3(f)(3)(i), quoted in footnote 11 *supra*, even remotely involve sizing and grading. Since Congress included "sizing" as a mining process in section 613(c)(4)(A) (relating to coal), it obviously was not unaware of its use; Congress' failure to list "sizing" in section 613(c)(4)(D) can only have been intentional. Therefore, the screening processes are not mining processes listed in section 613(c)(4)(D). Nor are they necessary or incidental to any mining process listed therein.

Petitioner argues that neither *United States* v. *Cannelton Sewer Pipe Co.*, *supra*, nor *Virginia Greenstone Co.* v. *United States*, 308 F. 2d 669, 672 (C.A. 4, 1962), nor any of the cases cited in footnote 19 *infra*, disallowed an extractive or concentrating process. This may be correct; but it is no aid to petitioner, for the removal of impurities in petitioner's screening processes is only incidental to the sizing. See sec.

[18] Sec. 1.613–3. Gross income from the property.

(g) *Nonmining processes*—* * *

(2) *Necessary or incidental processes; sequence.* (i) A process (even though otherwise nominally specified as a mining process in section 613(c) or this section) shall not be considered as mining if it functions in any significant degree as a necessary or incidental part of such nonmining processes as * * * packaging, or any other nonmining activity. * * *

1.613-3(g)(2)(i), Income Tax Regs. In this connection, petitioner's reliance on *Dow Chemical Co.*, 51 T.C. 669 (1969), on appeal (C.A. 6, Sept. 11, 1969), which involved the extraction of minerals from natural brine, is misplaced, because the Court there found (p. 677) that the brine was "not a commercially marketable or industrially usable product," and that the processes of extracting the various compounds from the brine were of necessity mining processes.

Relying upon language in the Supreme Court's decisions in *United States* v. *Cannelton Sewer Pipe Co.*, *supra* at 87, and *Riddell* v. *Monolith Cement Co.*, 371 U.S. 537, 539 (1963),[19] respondent contends that once a process is found to be nonmining it is a "cutoff point," and that subsequent processes must, therefore, likewise be considered as nonmining. It is true that in those cases the Court spoke of a point at which "mining" terminated and "nonmining" or "manufacturing" began. But it was never intended that a process specifically enumerated in the statute as a mining process should be considered as nonmining merely because it happened to follow rather than precede a nonmining process. Cf. *Dravo Corp.* v. *United States*, 172 Ct. Cl. 200, 348 F. 2d 542, 548 (1965). The particular sequence in which processes are applied is not the significant determinant—the nature and functions of each individual process and its relation to mining or nonmining are what is important.

That this is true is borne out by the legislative history of the Gore amendment, and even by the regulations. The Senate version of section 613(c)(5) would have provided that "Notwithstanding any other provisions of this subsection, any treatment process which follows a process that is not considered as 'mining' will not be considered as mining for the purpose of this subsection." H.R. 12381, 86th Cong., 2d Sess., p. 12 (1960). But this language ultimately was deleted from the general exclusion of section 613(c)(5), and its substance was limited to subparagraphs (F) and (G) of section 613(c)(4). Conf. Rept. No. 2005, 86th Cong., 2d Sess. (1960), 1960-2 C.B. 741, 745. The reason for the deletion was explained by Senator Byrd (106 Cong. Rec. 14514 (1960)) as follows:

It was thought best to omit this, because the otherwise allowable processes are not always applied by various manufacturers in this same order; and to omit a process in the case of one mineowner merely because it occurs after a disallowed process, would appear to discriminate against him.

---

[19] Also see *Standard Lime & Cement Co.* v. *United States*, 165 Ct.Cl. 180, 329 F. 2d 939, 946 (1964) ; *United States* v. *Portland Cement Co. of Utah*, 338 F. 2d 798, 801–802 (C.A. 10, 1964) (holding that, as to an integrated limestone miner-cement manufacturer, "mining terminates at the end of primary crushing") ; *Food Machinery & Chemical Corp.* v. *United States*, 348 F. 2d 921, 930 (Ct.Cl. 1965) ; *United States* v. *Light Aggregates, Inc.*, 343 F. 2d 429 (C.A. 8, 1965) ; cf. *Solite Corp.* v. *United States*, 375 F. 2d 684, 687 (C.A. 4, 1967) ; *Dow Chemical Co.*, 51 T.C. 669 (1969), on appeal (C.A. 6, Sept. 11, 1969).

The regulations, sec. 1.613–3(g)(2)(ii),[20] state a qualified general rule regarding the sequence of processes, as follows: *"Ordinarily*, a process applied subsequent to a nonmining process shall also be considered to be a nonmining process." (Emphasis added.) However, the regulations go on to provide, in consonance with the legislative history referred to above, that "exceptions to this rule shall be made in those instances in which the rule would discriminate between similarly situated producers of the same mineral." Further exceptions are made "in cases in which a nonmining process is incidental to a process specified as mining."

The regulations thus recognize that a strict application of the cut-off point concept is unwarranted. It is true that in most cases, i.e., "ordinarily," a process applied subsequent to a nonmining process will either involve nonmining itself or be incidental to the nonmining process it follows, and therefore not be subject to depletion. But in this case certain of petitioner's processes applied after the sizing at screens No. 5—the air tables and the magnetic separators—are specifically designated as mining. See sec. 1.613–3(f)(3)(i), Income Tax Regs., quoted in fn. 11 *supra*. They are not merely "nominally specified" as mining processes, cf. sec. 1.613–3(g)(2)(i), Income Tax Regs., quoted in fn. 18 *supra;* they involve "beneficiation by concentration" and are not necessary or incidental to nonmining processes. Therefore, the air tables and all the magnetic separators are to be considered as mining.

It is our conclusion, however, that none of the other processes in petitioner's grain mill or powder mill can be considered as mining. We have already discussed screens No. 5, and what we said there

---

[20] Sec. 1.613–3  Gross income from the property.

(g) *Nonmining processes*—* * *

(2) *Necessary or incidental processes; sequence.* * * *

(ii) Ordinarily, a process applied subsequent to a nonmining process shall also be considered to be a nonmining process. However, exceptions to this rule shall be made in those instances in which the rule would discriminate between similarly situated producers of the same mineral. For example, roasting is specifically designated in subdivision (i) of this subparagraph as a nonmining process, but in the case of minerals referred to in section 613(c)(4)(C) sintering is recognized as a mining process. However, if certain impurities in an ore can only be removed by roasting in order to bring it to the same shipping grade and form as a competitive sintered ore of the same kind which requires no roasting, the subsequent sintering of the roasted ore will be treated as a mining process, although the roasting of the ore is a nonmining process and will be treated as such. The test of nondiscrimination shall be applied by reference to the U.S. nationwide pattern of production in the particular mineral industry, except that, in the case of a mineral industry in which the U.S. pattern of production is shown to be unrepresentative of the pattern of production of U.S. taxpayers in such industry, the determination shall be made in light of the worldwide pattern of production by U.S. taxpayers in such industry. In addition, exceptions to the rule set forth in the first sentence of this subdivision shall be made in cases in which a nonmining process is incidental to a process specified as mining. See paragraph (f)(2)(iii) of this section for the definition of the term "incidental." For example, the sprinkling of coal with dots of paper to identify the coal for trade name purposes prior to loading for shipment shall not prevent the loading for shipment from being considered as mining.

applies with even greater force to the other sized screens (Nos. 6, 7, and 8) in the grain mill, where the garnet grains are further graded into the numerous sizes in which they are marketed.

We also think the treatment in the capillarity unit, where the temperature reaches 1660° F., is not an allowable process—that it constitutes "thermal action" or "roasting" within the meaning of section 613(c)(5). The capillarity unit serves none of the functions served by dryer H. The formation of a tough "skin," the healing of cracks, and the heat-induced change of color of the garnet grains constitute changes designed to improve marketability. These changes bring the treatment within the statutory list of disallowed processes. See *Virginia Greenstone Co.* v. *United States, supra* at 672; *Food Machinery & Chemical Corp.* v. *United States*, 348 F. 2d 921, 930, 931 (Ct. Cl. 1965). Furthermore, the treatment in the capillarity unit is not necessary or incidental to any mining process. Whatever contaminants are burned off in the capillarity unit are not accumulated from prior *mining* processes as were those decomposed in dryer H.

The powder mill processes likewise are nonmining, in that they constitute "refining" and/or "fine pulverization." The processes in the powder mill begin with a ball mill chamber (No. 2), which is a "size reduction" unit. Petitioner admits that "this grinding operation [in ball mill No. 2] may constitute fine pulverization," but argues that it nevertheless is a mining process because it liberates impurities and thus "is part of a concentration process" within section 613(c)(4)(D). In so arguing petitioner misconstrues the whole scheme and purpose of the Gore amendment. If a process is described by one of the terms of section 613(c)(5), we must be very cautious to find that it is "otherwise provided for" in section 613(c)(4). Ball milling itself, although a grinding process, is not a concentration process, but constitutes "fine pulverization," see *infra*, and is merely preparatory, i.e., "necessary or incidental," to the subsequent powder mill processes. Since we hold below that these latter processes constitute nonmining activities, the grinding in ball mill No. 2 is *a fortiori* a nonmining activity. Sec. 1.612–3(g)(2)(i), Income Tax Regs., quoted in fn. 18 *supra*.

Petitioner's inventory of powders includes a whole range of micron sizes (from 2 to 35 microns). The 2-micron size powder is invisible to the naked eye, requires 200 million particles to cover 1 square inch with a layer one particle in thickness, and is many times finer than pulverized limestone and ladies' face powder. We have found as a fact that production of the micron-size powders constitutes fine pulverization; hence, these operations are nonmining processes within section 613(c)(5).

The largest powder size produced by petitioner during the years in issue was designated as 240 mesh. To cover 1 square inch with a one-particle-thick layer of 240-mesh garnet powder would require 57,600 (240×240) particles. We believe that production of powder that small also constitutes fine pulverization and thus is a nonmining process.

The sizing in the powder mill also is a nonmining process, both for the reasons stated above in the discussion of sizing in the grain mill, and for the reason that it is "necessary or incidental" to the nonmining processes of fine pulverization and packaging. We hold, therefore, that all of petitioner's powder mill operations are nonmining processes, except for the magnetic separators, which are specifically considered as mining under section 613(c)(4)(D).

Packaging, the last of petitioner's processes, is neither listed in section 613(c)(4)(D) nor "necessary or incidental" to processes listed in that subparagraph. Therefore, it is a nondepletable nonmining process. See *Whitehall Cement Manufacturing Co.* v. *United States*, 369 F. 2d 468, 473–474 (C.A. 3, 1966).

In summary, we have concluded that of the disputed processes the following are to be considered as mining: Dryer H, the air tables, and the magnetic separators. All other disputed processes applied by petitioner during the years in issue are treatment processes not considered as mining, and thus are not subject to depletion.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*